589 F.2d 1166
 100 L.R.R.M. (BNA) 2225, 85 Lab.Cas. P 11,006
 The CATHOLIC MEDICAL CENTER OF BROOKLYN AND QUEENS, INC.,
Mary Immaculate Hospital Division and St. Mary's
Hospital Division, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 Nos. 288, 597, Dockets 78-4113, 78-4135.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 15, 1978.
Decided Dec. 15, 1978.
 
 John F. Gibbons, New York City (Kelley Drye & Warren, Frederick T. Shea, Paul L. Bressan, and Arthur S. Leonard, New York City, of counsel), for petitioner.
 Susan Tepper Papadopoulos, Washington, D. C. (N.L.R.B., Washington, D. C., John S. Irving, Gen. Counsel, John E. Higgins, Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C.), for respondent.
 Before LUMBARD, FRIENDLY and OAKES, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 The Catholic Medical Center of Brooklyn and Queens, Inc. (the Center) operates four non-profit hospitals in the two boroughs, two of which, Mary Immaculate and St. Mary's, are here involved. It asks us to set aside an order of the National Labor Relations Board, 236 NLRB No. 59; the Board requests us to enforce it. The Board found, affirming one of its administrative law judges, that the Center had violated § 8(a)(5) and (1) of the National Labor Relations Act by refusing to bargain with the New York State Federation of Physicians and Dentists (the Union) which the Board had certified, over the Center's objections, as the exclusive bargaining representative of salaried physicians and dentists after Board-conducted elections at Mary Immaculate and St. Mary's. The Board also found, again affirming the ALJ, that the Center had violated § 8(a)(3) and (1) by suspending for three weeks in the two certified units the salary increase reviews that were being accorded its other salaried physicians and dentists. It entered a "broad order" requiring the Center to cease and desist from in any manner infringing upon the exercise of employee rights.
 
 
 2
 Promptly after the elections on February 26, 1976, the Center filed objections, one of them being that the elections were invalid because of pro-union activity by supervisors. The Regional Director overruled these on August 27, 1976. After the Center had filed exceptions, the Board, on November 15, 1976, endorsed the Regional Director's ruling, without discussing the question of taint by supervisors' activity. When counsel for the Union requested negotiations and certain information, the Center's lawyer declined in a letter dated February 28, 1977 because the Center desired to obtain judicial review of the overruling of its objections and, as is conceded, there was no other method for securing it. This became the basis for so much of the General Counsel's complaint as charged a violation of § 8(a)(5) and (1). The charge under § 8(a)(3) stemmed from the following: In November 1975 financial difficulties had forced the Center to suspend its policy of periodic salary increase reviews for its physicians and dentists. By early 1977 the fiscal position had improved so as to permit it to begin such a review on February 15. Initially the review did not include physicians and dentists in the certified units, allegedly because the Center feared that a unilateral grant of increases might constitute an unfair labor practice under NLRB v. Exchange Parts Co., 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964), and NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). When the Union filed an unfair labor practice charge because of this on February 24, 1977, the Center's director of industrial relations considered that this threat no longer existed and, in the same February 28 letter referred to above, the Center's lawyer advised the Union's counsel that the physicians and dentists in the certified units would be included in the salary increase review program. In consequence, about March 17, 1977, based on a review process begun on March 8, the physicians and dentists in the units received salary increases retroactive to January 1, 1977, the same date applied to physicians and dentists not in the units. The only difference in treatment was that the latter had received their increases about three weeks earlier. After a hearing the ALJ determined that both unfair labor practices had been established.[1] He considered that the unfair labor practices found were "of a character which go to the very heart of the policies of the Act" and recommended, in addition to orders requiring compliance with § 8(a)(5) and (3), including "back-pay", "computed in accordance with the formula set forth in F. W. Woolworth Company, 190 NLRB 289 (1950), with interest thereon computed in the manner prescribed in Florida Steel Corporation, 231 NLRB No. 117 (1977), a broad order which, with minor modifications not here material,[2] a three-member panel of the Board entered without comment on the merits.
 
 
 3
 The only objection to the certification still pressed by the Center is the active participation by supervisors on behalf of the Union a ground which, if established, could invalidate the elections even though the efforts of supervisors were to support, rather than, as is more commonly the case, to oppose unionization. Turner's Express Incorporated v. NLRB, 456 F.2d 289 (4 Cir. 1972); NLRB v. Piggly Wiggly Red River Co., 464 F.2d 106, 108 (8 Cir. 1972); NLRB v. Roselon Southern, Inc., 382 F.2d 245 (6 Cir. 1967). Cf. NLRB v. Metropolitan Life Ins. Co., 405 F.2d 1169, 1178 (2 Cir. 1968) (election set aside because supervisors were permitted to participate in campaign and vote in election though union would have won even without their votes). The "supervisors" here in question were physicians who were directors of various departments of the hospitals; the Regional Director found that they were in fact supervisors and the Board does not dispute this.
 
 
 4
 In the spring of 1975, Dr. Calvin Norman, director of radiology at St. Mary's and three other supervisors, Drs. Gotta, Jadwat and Cardo,[3] met with an attorney concerning the organization of the Center's salaried physicians. The attorney advised that this was possible but that the supervisors could not be in the bargaining unit. The four supervisors held three or four meetings during May or June 1975 at or near the hospitals here concerned in order to get an indication of employee interest in and to enlist support for forming a labor organization. Around this time Dr. Norman received an unsolicited call from the Union stating it had been formed to represent physicians. This was followed by a meeting with the four doctors which was attended by three Union officials including Larry Nathan, its executive secretary. Nathan thought he had distributed a number of blank authorization cards; Dr. Norman agreed but the three other supervisors denied this. Dr. Norman signed an authorization card at that time.
 
 
 5
 In October or November 1975, Nathan was contacted by a physician who advised that an organizing campaign might be fruitful. The Union conducted its campaign by telephone and mail. Dr. Norman and another of the supervisors who had been active from the outset supplied Nathan with names of physicians and dentists who might be interested.
 
 
 6
 By December 18, 1975, the Union thought it had assembled sufficient support to enable it to file with the Board's regional office a petition seeking an election among all the Center's salaried physicians scheduled to work more than 15 hours per week. On December 31 the Center's Director of Labor Relations and counsel, and Nathan and the Union's counsel met with a Board agent. The Center's counsel questioned the adequacy of the Union's showing of interest. After the agent stated there was a problem about this and the petition had been amended to include dentists, the agent informed the Center's director and counsel that the Union was withdrawing its petition. As the director and counsel were leaving, Nathan said "I'll be back. I'll see you in a couple of weeks." True to that promise, the Union filed two new petitions limited to salaried physicians and dentists at Mary Immaculate and St. Mary's respectively, on January 15, 1976.
 
 
 7
 The Regional Director found there had been extensive activity by supervisors on behalf of the Union. In addition to having distributed authorization cards, Dr. Norman before and after January 15, 1976, spoke to eligible voters and declared his personal support for unionization in general and for the Union in particular. In late December 1975 Dr. Norman gave Dr. Cardo some 10 authorization cards. On December 31, 1975, the day on which the Union amended its petition to include dentists, Dr. Cardo signed a card, obtained signatures from other dentists and returned the cards to the Union. Both before and after January 15, 1976, he advocated the Union's cause with dentists at Mary Immaculate and anaesthesiologists at St. Mary's. The evidence with respect to Dr. Jadwat was less substantial; about all that was established was that he signed authorization cards on July 23 and December 30, 1975 and offered on the latter date to transmit to the Union a card signed by an anaesthesiologist on his staff. Dr. Anel, senior emergency room physician at Mary Immaculate, who was found to be a supervisor, signed an authorization card on December 30, 1975, and asked an emergency room physician to sign one on the same date. A number of other supervisors signed authorization cards, only one of them, Dr. Wadhwa, director of employee health at St. Mary's, after January 15, 1976. The Center had made its opposition to the Union clear to both the supervisors and the employees.
 
 
 8
 In appraising this evidence the Regional Director and, as we must assume from its approval, the Board were guided by a principle which the Regional Director stated as follows:
 
 
 9
 The Board, in considering objections to an election, looks only to evidence of conduct which occurred between the time the petition is filed and the election is held. In the case of petitions filed seriatim, the Board relies upon only conduct between the filing of the last petition and the date of the election. These rules are applicable to allegations of supervisory assistance in a union organizational campaign which occur prior to the critical period, although such conduct may be considered to give meaning and dimension to related conduct which occurs during the critical period. . . . (Footnotes omitted.)
 
 
 10
 Proceeding on this basis the Regional Director found that
 
 
 11
 (T)he above evidence constitutes insufficient basis for concluding that the voters were precluded from exercising a free choice in the election. Although several supervisory physicians and dentists joined and supported Petitioner from the beginning of its campaign, their only activities during the critical period which commenced on January 15, 1976, consisted of statements of preference for Petitioner and signing in private of an authorization card by a director employed at St. Mary's.
 
 
 12
 With the focus thus limited to acts that were indeed insignificant, even when given "meaning and dimension" by the extensive earlier activities, particularly on the part of Drs. Norman and Cardo, the Regional Director had no difficulty in regarding "the nature of the supervisory support of Petitioner during the critical period," to wit, the period after January 15, 1976, "as minimal and which would not have affected the results of the election."
 
 
 13
 The Board has indeed said it to be "axiomatic that the Board, in considering objections to an election, looks only to evidence of conduct which occurred between the time the petition is filed and the election is held," Head Ski Company, Inc., 192 NLRB 217, 218 (1971), although the evidence ruled out in that case related to post-election conduct. The axiom derives from Ideal Electric & Manufacturing Co., 134 NLRB 1275, 1277-78 (1961).
 
 
 14
 The Administrative Procedure Act, 5 U.S.C. § 556(d), provides that an "agency as a matter of policy shall provide for the exclusion of irrelevant, immaterial or unduly repetitious evidence." By negative implication an agency thus may not provide for the exclusion of relevant evidence not protected by a privilege or countervailing policy, defined in Federal Rules of Evidence 401, as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[4] The evidence which the Regional Director refused to consider clearly passed that test, see 4 Weinstein's Evidence § 401(06) (1977). Exclusion of evidence of conduct before January 15, 1976 can thus be justified if but only if the Board properly ruled it out on an adequate substantive rather than evidentiary ground, to wit, that pre-petition conduct, at least of the sort here involved, does not invalidate an election as a matter of law.
 
 
 15
 While at first blush such a position seems surprising, more can be said for it than could be gathered from the perfunctory brief filed by the Board's counsel. No one would glean from this that in fact Ideal Electric was a liberalizing decision which set an earlier cut-off date than the one that had been established in Great Atlantic & Pacific Tea Co., 101 NLRB 1118 (1952) and the still later one fixed for some cases in F. W. Woolworth Co., 109 NLRB 1446 (1954). See Morris, The Developing Labor Law 78-80 (1971). Still less would anyone realize that The Great Atlantic & Pacific Tea Company decision itself was a liberalization of previous Board policy.
 
 
 16
 Before that decision the Board applied a rule whereby a party which had participated in an election was estopped from complaining of pre-election conduct by an adversary, of which it had knowledge, when it neither filed charges nor otherwise protested to the Board until after the election. Concluding that this policy presented the offended party with a Hobson's choice, the Board overruled these decisions in Great Atlantic & Pacific and decided that whether or not charges had been filed, it would consider any alleged interference after (1) the execution of a consent-election agreement or a stipulation for certification upon consent election, or (2) the date of issuance by the Regional Director of a notice of hearing. The Board went on to say, without explanation, that it "will not, however, consider election objections based upon interference which may occur prior to these dates." 101 NLRB 1121.
 
 
 17
 F. W. Woolworth Co., supra, 109 NLRB 1446 (1954), a decision anticipated by The Liberal Market, Inc., 108 NLRB 1481 (1954), modified The Great Atlantic & Pacific Tea Co., rule in one respect. Taking account of the fact that the rule there adopted produced a much longer "critical period" in cases where the right to an election was contested than where it was not, the Board decided that in cases of the former type the cut-off date would henceforth be the decision and direction of election or, where an amended decision and direction of election issued, the date of the amended decision and direction. Again there was no explanation why the cut-off should not come earlier.
 
 
 18
 Ideal Electric was a controversy between an incumbent union and another seeking to supplant it. The incumbent won the election and the challenger complained of improper conduct, to wit, the incumbent's negotiation of an apparently favorable contract after the petition for an election but prior to the decision and direction. The Regional Director deemed himself precluded from considering this. The Board referred to Woolworth as having "had the advantage of eliminating from post-election consideration conduct too remote to have prevented the free choice guaranteed by Section 7" but also as having "resulted in the Board's not considering much of the activity occurring during the election campaign and enhanced the possibility of intentional delay at the hearing stage by a party contestant seeking to campaign improperly before the cut-off date", Id. at 1277-78, and cited the reduction in the elapsed time between the filing of petitions and the elections held pursuant to them as a result of delegation of power to Regional Directors. In light of these considerations the Board made the filing of the election petition the cut-off date. The lack of explanation why the cut-off date should not have been moved still further is thus readily accounted for; apparently no one had asked the Board to do this. In Goodyear Tire and Rubber Co., 138 NLRB 453 (1962), a sharply divided Board extended the Ideal Electric rule to consent elections. In Dickensian language the majority declared "this standard the date of the petition to be a simpler and more workable standard than we have ever had before." Id. at 455.
 
 
 19
 It could thus be strongly argued that the Ideal Electric-Goodyear rule is simply another example of the Board's extrapolating from the broad language of the National Labor Relations Act more detailed standards which will assist the parties in conforming their conduct to the law and avoid the need of weighing the precise effect of alleged misconduct in every case a process which has been endorsed by the Supreme Court, see, e. g., Republic Aviation Corp. v. NLRB, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945) (employer rule prohibiting employees from soliciting for union on company property on their own time is an unfair labor practice), and Brooks v. NLRB, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954) (refusal to bargain within "certification year" is an unfair labor practice even if union has lost majority through no unfair practice by employer), and applauded by commentators. See K. C. Davis, Administrative Law Treatise § 75.04, especially at 372-73 (1958); Friendly, The Federal Administrative Agencies: The Need for Better Definition of Standards 36-38, 42-43 (1962). On this view, the Board might be thought justified in determining that the administrative benefits of the cut-off provided by Ideal Electric and Goodyear outweighed the harm bound to be inflicted by any inflexible rule. These include the disagreeable task of saying that misconduct which in fact would have influenced an election must be disregarded for purposes of challenging it if the misconduct occurred prior to the filing of an election petition,[5] even though still prosecutable as an unfair labor practice under the six months proviso of § 10(b), and the opportunities afforded, particularly to unions, to immunize improper conduct by delay in filing an election petition a point quite similar to that which led the Board to replace the Woolworth standard with the more liberal one of Ideal Electric. Beyond this it could be argued that the duty imposed upon the Board to maintain a "laboratory" during an election, see General Shoe Corp., 77 NLRB 124, 127 (1948), cannot reasonably be thought to begin before its processes have been invoked.
 
 
 20
 Assuming without deciding the validity of the Ideal Electric-Goodyear cut-off in the ordinary run of cases, we are here faced with the narrower question of its application to a case where the misconduct occurred during the pendency of a petition for election subsequently withdrawn and shortly replaced.[6] Board counsel here rely on Allied Foods, Inc., 189 NLRB 513 (1971), enforced 456 F.2d 1286 (5 Cir. 1972). However, both the Board and the court opinions in Allied Foods are slender reeds. After reciting "(w)e are thus satisfied that there is no basis warranting departure from the Ideal Electric rule in this case and consider the date upon which the operative petition was filed, February 13, 1970, as the critical date for consideration of the objections to the election", the Board went on with an extended, and persuasive, discussion why "even assuming that the alleged conduct in question occurred during the critical period prior to the election, we are not convinced that the conduct in any event would constitute grounds for setting aside the election." The Fifth Circuit granted enforcement in a proceeding on its summary calendar, and the opinion says only that a careful review convinced the court that the order should be enforced, without indicating which of the alternate grounds advanced by the Board had proved persuasive.
 
 
 21
 Shortly thereafter, the Board revisited the subject of successive petitions in the important case of R. Dakin & Company, 191 NLRB 343 (1971), enforcement denied and cause remanded, 477 F.2d 492 (9 Cir. 1973), opinion on remand, 207 NLRB 521 (1973). In that case the union had filed an initial petition on October 14, 1968, which it withdrew on November 4; a second on November 4, which it withdrew on November 8; and a third and ultimate one on December 5. At issue was union misconduct in mid-November. The Board concluded, 191 NLRB at 344, that "(a)s there was no petition on file when the objectionable conduct occurred and, as there is no evidence to support any claim that the second petition had been withdrawn so as deliberately to create an insulated opportunity for the Union to engage in objectionable conduct", it would refuse to take account of conduct prior to the filing of the third petition.
 
 
 22
 The Dakin decision did not fare well. In NLRB v. R. Dakin & Co., 477 F.2d 492, 493 (9 Cir. 1973),[7] the court set aside the Board's bargaining order. It characterized the Ideal Electric rule as "simply an evidentiary device calculated to render irrelevant upon a post election contest, conduct 'too remote' to have interfered with the employees' free choice guaranteed by Sec. 7 of the Act." Stating that "we would pay great deference to a Board created cut-off date which is applied to some types of pre-election misconduct, even though we might believe that the lapse of time was not of sufficient length to render that conduct innocuous", the court was not prepared to approve a rule "which flatly bars the consideration of all pre-petition misconduct" in a case where the charges raised a substantial issue regarding the validity of the election. The court cited NLRB v. Lawrence Typographical Union No. 570, 376 F.2d 643, 752 (10 Cir. 1967), which had held that the Board could not blindly follow the Ideal Electric rule, but must consider pre-petition offers of super-seniority to strike replacements, since "(a)n offer of super-seniority is not the kind of unfair labor practice that dissipates in its coercive effects over a relatively short period of time".
 
 
 23
 The Board's reception of the court's decision was no more kindly than the court's reception of the Board's. In R. Dakin & Company, 207 NLRB 521 (1973), the Board accepted the court's ruling as "the rule of law now governing disposition of this case, and this case only," see also 207 NLRB at 522 n. 9, and set the election aside.
 
 
 24
 After a reference in Regency Electronics, Inc., 215 NLRB 847, 850 n. 10 (1974) to "the court's relaxed approach to the cutoff date rule" in Dakin, the Board returned to the problem in Monroe Tube Company, 220 NLRB 302, 305 (1975), enforcement denied on other grounds, 545 F.2d 1320 (2 Cir. 1976). Here the shoe was on the other foot the union was complaining of the employer. The union had filed a petition on August 16, 1973, withdrew it on September 5, and refiled on September 6. The employer misconduct occurred during the pendency of the first petition. After noting the position taken in Dakin I (without referring to the Ninth Circuit's reversal), namely, that the Board has refused to evaluate conduct that occurred prior to the filing of the petition which resulted in the election, it distinguished that case on the ground that "no petition was on file at the time when the alleged misconduct occurred". The Board went on to say
 
 
 25
 In this case where the first petition was filed a short time prior to the filing of the second petition and a petition was on file at the time that unlawful conduct took place, we deem it proper to begin the critical period at the filing of the first petition and to evaluate conduct occurring from that date until the election.
 
 
 26
 So far as we are aware, this is the Board's latest word on the subject.
 
 
 27
 Even if, as suggested earlier in our discussion, Ideal Electric may be something more than the simple "evidentiary device" which the Ninth Circuit thought it to be, 477 F.2d at 494, we believe it must be qualified at least to the extent stated in Monroe Tube.[8] None of the considerations that support the Ideal Electric-Goodyear rule in general applies in such a case. Moreover the Board's deciding this case in a manner which, so far as we can see, is directly contrary to Monroe Tube,[9] without even saying why, is archetypical of arbitrary and capricious action. Secretary of Agriculture v. United States, 347 U.S. 645, 653, 74 S.Ct. 826, 98 L.Ed. 1015 (1954); International Union (UAW) v. NLRB, 148 U.S.App.D.C. 305, 311, 459 F.2d 1329, 1341 (1972); Sirbo Holdings, Inc. v. C. I. R., 476 F.2d 981, 987 (2 Cir. 1973); NLRB v. Local Union No. 584, Intl. Bro. of Teamsters, 535 F.2d 205, 207-08 (2 Cir. 1976); NLRB v. Silver Local No. 962, Intl. Bro. of P. S. & P. M. W., 498 F.2d 26, 29 (9 Cir. 1974).
 
 
 28
 Counsel for the Board argues that even if the Regional Director should have considered all supervisory activity prior to January 16, 1976, "the totality of the supervisory conduct here . . . does not warrant setting aside the election." However, we cannot sustain the Board on a basis advanced by counsel which might or might not have been followed by the Board itself. Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962), applying SEC v. Chenery Corporation, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943).
 
 
 29
 It follows that so much of the order as found the Center guilty of a refusal to bargain must be set aside and the cause remanded for consideration of supervisory activity prior to the filing of the second petition."
 
 
 30
 With respect to the § 8(a)(3) violation the Center argues that it was confronted or at least thought it was confronted, with the dilemma which led this court to deny enforcement in NLRB v. Dorn's Transportation Co., 405 F.2d 706 (2 Cir. 1969) and J. J. Newberry Co. v. NLRB, 442 F.2d 897 (2 Cir. 1971). The Board responds that the dilemma found to exist in cases where an organizational campaign was still in progress was not present here, since the Union had been certified on November 15, 1976. It relies on our statement in NLRB v. United Aircraft Corp., 490 F.2d 1105, 1111 (2 Cir. 1973), that
 
 
 31
 (U)nlike the employers in Dorn's and Newberry, where no union had yet become bargaining representative, the Company here could have avoided all risk by notifying and consulting with the Union as to the course to be followed. 6
 
 
 32
 We think this is true even though the Center was challenging the certification. However, this three-week delay, a year after the election, in considering the unit employees for salary review, allegedly founded on a good faith although erroneous belief that such action was required, and fully rectified as soon as the Union complained, must be one of the most inconsequential unfair labor practices in the history of the National Labor Relations Act.[10] The Center argues that if there were any violation, this should have been disregarded under the Board's De minimis doctrine.[11] We need not now decide this since in any event the Board should reconsider its action in light of our ruling on the § 8(a)(5) charge. We vacate the § 8(a)(3) order to permit full reconsideration.
 
 
 33
 Stating that "(t)he unfair labor practices found being of a character which go to the very heart of the policies of the Act", the ALJ recommended that the Center "be required to cease and desist from in any manner infringing upon the exercise of employee rights," a recommendation which the Board adopted, over exception, without comment. The sole authority which the ALJ cited was NLRB v. Entwistle Mfg. Co., 120 F.2d 532, 536 (4 Cir. 1941), a blatantly discriminatory discharge of a leading union sympathizer. It requires a type of mind different from ours to discern a dispositive similarity between the Center's unfair labor practices and Entwistle's. The unfair labor practices the Center was found to have committed were (1) pursuing, in good faith, and on substantial grounds, a course designed to obtain review of the Board's certification which was approved by the Supreme Court as long ago as 1941 in Pittsburgh Plate Glass Co. v. NLRB, 313 U.S. 146, 154, 61 S.Ct. 908, 85 L.Ed. 1251, and has been followed by thousands of law-abiding employers, and (2) the inconsequential § 8(a)(3) violation just discussed. If what the Center did goes "to the very heart of the Act", one wonders what unfair labor practices merely penetrate the skin. This was a paradigm case for application of the narrow order principle announced in NLRB v. Express Publishing Co., 312 U.S. 426, 435-38, 61 S.Ct. 693, 85 L.Ed. 930 (1941).
 
 
 34
 So much of the orders as found violations of § 8(a)(5) and (3) and consequently of § 8(a)(1) are vacated and the case is remanded to the Board for further proceedings consistent with this opinion. The "broad order" is set aside, with instructions that the cease and desist provisions of such order, if any, as may hereafter be entered shall be limited to the unfair labor practices found and other like or related unlawful acts.
 
 
 
 [1]
 The ALJ did not reexamine the Center's objections to the certifications
 
 
 [2]
 The Board did discern that no backpay was owing since it had already been paid. Nothing but interest was needed to make the unit employees whole; according to petitioner, the maximum allowance would be three weeks' interest on 41/2% Of an individual's take-home salary
 
 
 [3]
 Dr. Gotta was director of anaesthesiology at St. Mary's, Dr. Jadwat held the same post at Mary Immaculate, and Dr. Cardo was chief of oral surgery at St. Mary's
 
 
 [4]
 The Taft-Hartley Act amended § 10(b) of the National Labor Relations Act to provide that an unfair labor practice proceeding "shall, so far as practicable, be conducted in accordance with the rules of evidence applicable in the district courts of the United States under the rules of civil procedure for the district courts of the United States, adopted by the Supreme Court of the United States." See NLRB v. Stark, 525 F.2d 422, 426-30 (2 Cir. 1975), Cert. denied, 424 U.S. 967, 96 S.Ct. 1463, 47 L.Ed.2d 734 (1976). The question whether this should now be read to include the Federal Rules of Evidence, which replace former F.R.Civ.P. 43, seems not yet to have been decided. See, however, L. S. Ayres & Co. v. NLRB, 551 F.2d 586, 588 (4 Cir. 1977); NLRB v. Hale Mfg. Co., 570 F.2d 705, 710-11 (8 Cir. 1978); Sturgis-Newport Business Forms, Inc. v. NLRB, 563 F.2d 1252 (5 Cir. 1977); and NLRB v. Pope Maintenance Corp., 573 F.2d 898, 906-07 (5 Cir. 1978) all dealing, like Stark, with the sequestration rule. In any event the quoted provision of § 10(b) would probably not apply to an investigation of the validity of an election under § 9, despite the principle that an issue fully litigated in a representation proceeding will not be relitigated in an unfair labor practice proceeding based upon it in the absence of new evidence, see, e. g., NLRB v. Union Brothers, Inc., 403 F.2d 883, 887 (4 Cir. 1968)
 
 
 [5]
 In fact the Board has not done this where the misconduct was egregious, see Weather Seal Incorporated, 161 NLRB 1226 (1966); Willis Shaw Frozen Express, 209 NLRB 267 (1974); Servomaton of Columbus, Inc., 219 NLRB 504, 505 (1975); Baker Machine & Gear, Inc., 220 NLRB 194, 207 (1975)
 
 
 [6]
 As we read the Center's brief, its attack on the Ideal Electric doctrine as applied to conduct prior to the first petition, was limited to one ground. This was that in Gibson's Discount Center, 214 NLRB 221 (1974), the Board applied NLRB v. Savair Mfg. Co., 414 U.S. 270, 94 S.Ct. 495, 38 L.Ed.2d 495 (1973) (election will be invalidated when union has offered to waive initiation fees for employees signing before the election) in a case where the offer was made before the petition was filed. See also Lyon's Restaurants, 234 NLRB No. 10 (1978) (pre-petition threats of job loss if employees would not join union). Both these opinions indicated the uniqueness of the situations; in Gibson's Discount the Board expressly stated that it did "not otherwise intend any broad departure from the Ideal Electric rule." 214 NLRB at 222 n. 3. Neither Gibson's Discount nor Lyon's Restaurants would be applicable here. If, on the remand we are directing, the Center wishes to attack Ideal Electric more generally, it is free to do so
 
 
 [7]
 Incredibly the only reference to this case that we have found in the entire proceeding is a discussion of the court opinion in petitioner's reply brief to us
 
 
 [8]
 We see no force in the distinction proffered by the Board's counsel, namely, that in Monroe Tube "the second petition was filed the day after the first petition was withdrawn so that, in essence, a petition was on file continuously." (Brief, p. 11). The Board rested Monroe Tube on the basis that the employer misconduct occurred in late August, 1975, when the first petition was on file, just as here the union misconduct occurred in late December, 1976, when the first petition was on file. On the most literal interpretation of this language in Monroe Tube, all that would be justified would be the exclusion of incidents in the gap between January 1 and 15, 1976, whereas most of the Center's evidence related to activities in late December, 1975, when the first petition was on file. Although there is no need to decide the point, we would doubt the validity of such a position in a case like this where on withdrawing the first petition the Union announced its intention to refile. Contrast Sigo Corporation, 146 NLRB 1484, 1486 (1964), where an employer who made a unilateral offer of benefits in the interval between petitions could reasonably have assumed "that the Union had lost interest in organizing the employees." Moreover, whatever deference we might owe to a distinction of Monroe Tube made by the Board in this case, none is due when, so far as appears, the applicability of that case was never considered
 
 
 [9]
 It is not clear from the papers before us that petitioner called Monroe Tube to the attention of the Regional Director, the ALJ or the Board. However, the substantive point was made, and this satisfies the third sentence of § 10(e). Board counsel do not contend otherwise. The Board's Regional Director, ALJ and large legal staff should surely have been aware of such a recent and important decision
 
 
 [6]
 During a representation campaign, as in Dorn's and Newberry, an employer has no one to consult to escape the alleged dilemma. The union is not yet the bargaining representative, and the employees are the very persons whom the employer may be accused of bribing or coercing. Even after a union becomes bargaining representative, of course, its response to an employer's efforts to consult may be uncooperative or ambiguous. But we do not think an employer can justifiably claim that it is faced with a legal dilemma unless it first seeks union guidance
 
 
 [10]
 There is a never-never land quality about a case where an agency has excluded highly relevant evidence of union misconduct, in the name of administrative efficiency, because it occurred a few weeks before the filing of the "operative" election petition, yet committed public funds to the prosecution of the minuscule § 8(a)(3) violation here alleged
 
 
 [11]
 See Thermalloy Corp., 213 NLRB 129 (1974); Fearn International, Inc., 209 NLRB 232 (1974); Skyline Mobile Homes, 200 NLRB 109 (1972). Board counsel distinguishes these cases on the ground that each concerned a minor incident involving a single employee