ITT LIGHTING FIXTURES, DIVISION
OF ITT CORPORATION, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 771, Docket 80–4203.

United States Court of Appeals,
Second Circuit.

Argued March 30, 1981.
Decided Sept. 1, 1981.

Arnold E. Perl, Richard M. Kobdish, Young & Perl, Memphis, Tenn., for petitioner.

William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Howard E. Perlstein, Victoria A. Higman, Attys., N.L.R.B., Washington, D. C., for respondent.

Before WATERMAN and MANSFIELD, Circuit Judges and B. NEWMAN, Judge.*

WATERMAN, Circuit Judge:

This case is before this Court upon the petition of ITT Lighting Fixtures, Division of ITT Corporation ("Company") to review and set aside an order of the National Labor Relations Board ("Board") issued on September 26, 1980, and reported at 252 N.L.R.B. No. 46. The Board has cross-petitioned for enforcement of its order. Inasmuch as the Company transacts business within this judicial circuit, this Court has jurisdiction of the proceeding. 29 U.S.C. § 160(e) and (f).

The Company is engaged in the manufacture of lighting fixtures at its Southaven, Mississippi, facility, and it has a warehouse facility located in Memphis, Tennessee. On December 14, 1978, the International Union, United Automobile, Aerospace & Agricultural Implement Workers of America,

* Of the U.S. Court of International Trade, sitting by designation.

UAW, ("Union") filed a representation petition with the Board, seeking certification as the exclusive bargaining representative of the Company's production, maintenance and warehouse employees. Pursuant to the petition, a hearing was held with reference to defining the membership of the bargaining unit, at which the supervisory status of the Company's groupleaders was litigated.[1] On January 22, 1979, the Regional Director issued his Decision and Direction of Election. He found that the Union's proposed unit was an appropriate unit.[2] The Regional Director was unable to determine whether the groupleaders were unit employees or, as the Company contended, supervisors within the meaning of Section 2(11) of the National Labor Relations Act, as amended, 29 U.S.C. 152(11) ("Act") and, accordingly, permitted them to vote by challenged ballot in the representation election. The Company's request that the Board review the Regional Director's failure to exclude the groupleaders from the unit was denied by the Board.

On February 16, 1979, pursuant to the Regional Director's Decision and Direction of Election, the Board conducted a secret ballot election. The tally of ballots showed that there were 362 ballots cast, of which 175 were cast for the Union, 153 against the Union and 34 that were challenged and not counted. Thus, the challenged ballots were sufficient in number to affect the results of the election. Thirty-one of these challenged ballots were cast by groupleaders.

Subsequent to the election, the Company timely filed Objections to Conduct Affecting the Results of the Election in which it alleged that it was severely prejudiced at the outset by the Regional Director's failure to find the groupleaders to be supervisors, and that the Union's showing of employee interest in unionization was tainted by the open and pervasive involvement of the groupleaders in activities on behalf of the Union. The Regional Director ordered an evidentiary hearing on the challenged ballots and on the Company's objections. After five days of testimony, the Hearing Officer issued his Report and Recommendations on Employer's Objections wherein he concluded, *inter alia*, that (1) the challenges to the ballots of the groupleaders be sustained inasmuch as they were supervisors within the meaning of the Act; and (2) the Company's above-mentioned objections be overruled.

The Regional Director, assuming arguendo that the groupleaders were in fact supervisors, adopted the Hearing Officer's recommendation that the Company's objection to their pro-union activities be overruled. However, the Regional Director sustained challenges to only 11 of the ballots of the groupleaders.[3] He found that a resolution of the other challenged ballots was unneces-

1. Section 2(3) of the National Labor Relations Act, as amended, 29 U.S.C. § 152(3), excludes from the definition of employee "any individual employed as a supervisor." Section 2(11) of the Act, 29 U.S.C. § 152(11), defines "supervisor" as follows:

    (11) The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

2. All full-time and regular part-time production and maintenance employees, including tool crib attendant, shipping department and warehouse receiving department employees and clerks, tool and die shop employees, mechanical lab technicians, electrical lab technicians and quality control lab technicians, employed at the Employer's Southaven, Mississippi, location, and all employees employed at the Employer's warehouse located on Titan Drive in Memphis, Tennessee, including traffic control clerks, excluding office clerical employees, engineering department employees, technical employees, over-the-road truckdrivers, general foremen, foremen, guards and supervisors as defined in the Act. (Joint Appendix ("J.A."), p. 691)

3. Those groupleaders found to be supervisors by the Regional Director were: Christine Brown, Lonnie Edlin, Richard Hayes, Carolyn Smith, Billie Hamilton, Marie Mason, Shirley Spencer, Gilbert Vickers, Rebecca Jo Hamilton, Bobby Hobbs, and Joan Carson. (J.A. pp. 747–752).

sary inasmuch as they would not affect the outcome of the election.[4] Thereupon the Regional Director filed a Supplemental Decision and Certification of Representation, certifying the Union as the exclusive bargaining representative for the Company's production, maintenance and warehouse employees employed at both of the Company's locations.

The Company filed a request for Board review of the Regional Director's Supplemental Decision and Certification of Representation. The Board only granted the Company's request for review of the issue of the challenged ballots. Nine months later, the Board filed its decision. It sustained the Regional Director's findings that the eleven groupleaders were supervisors, and further found an additional four groupleaders to be such.[5] It left unresolved the status of the other sixteen groupleaders inasmuch as their ballots "cannot affect the election results and, consequently, further action with respect to them is unnecessary." The Board, accordingly, adopted the Regional Director's Certification of Representation. (249 N.L.R.B. No. 61).

The Company, however, refused to bargain with the Union on the ground that the Union was improperly certified, and, on October 2, 1979, the Board issued a complaint against the Company after receiving charges filed by the Union. The Company opposed the complaint and, opposing a subsequent motion for summary judgment, again raised objections to the propriety of the Board's certification of the union as the exclusive collective bargaining agent. On September 26, 1980, the Board granted the motion for summary judgment. It found the Company to be in violation of Section 8(a)(5) and (1) of the Act (29 U.S.C. § 158(a)(5) and (1)) by refusing to bargain with the Union. The Board ordered the Company to bargain collectively with the Union. In its cross-petition the Board now seeks enforcement of that order.

■ The Company has concededly refused to bargain with the Union in order to obtain the judicial review it now seeks here of the Board's certification of the Union as the exclusive collective bargaining representative of the Company's employees.[6] Thus, the only issue before us on appeal is whether the pro-union statements and activities of many of the Company's groupleaders impaired the employees' freedoms of choice in the election so as to justify setting the election aside.

Charged with the responsibility of overseeing the activities of the participants in Board elections, the Board has viewed its function as one of ensuring that

> ... employees have the opportunity to cast their ballots for or against a labor organization in an atmosphere conducive to the sober and informed exercise of the franchise, free not only from interference, restraint, or coercion violative of the Act, but also from other elements which prevent or impede a reasoned choice.

*Sewell Manufacturing Company*, 138 N.L.R.B. 66, 70 (1962).

■ It is well-established that the participation of a supervisor in a union election may in some circumstances so undermine the employees' freedom of choice as to warrant setting the election aside. *Catholic Medical Ctr. of Brooklyn, etc. v. NLRB*, 620 F.2d 20, 22 (2d Cir. 1980); *NLRB v. Handy Hardware Wholesale, Inc.*, 542 F.2d

---

4. Thirteen ballots were not counted, for the Regional Director threw out two ballots in addition to the eleven ballots cast by individuals whom he held to be supervisors. Inasmuch as the Union had won the election by a margin of twenty-two votes, the remaining twenty-one challenged ballots cast by groupleaders, even assuming that they all had been cast against the Union, could not affect the results of the election.

5. Those groupleaders found to be supervisors by the Board included: Jeanette Millington, Sammie Williams, Barry Williams and John McNeely. (J.A. p. 854).

6. This Court has noted in the past that a refusal to bargain, if it is a course pursued in good faith and on substantial grounds, is an appropriate means of obtaining judicial review of the Board's certification. *Catholic Med. Ctr. of Brooklyn & Queens v. NLRB*, 589 F.2d 1166, 1175 (2d Cir. 1978).

935, # 938 (5th Cir. 1976), *cert. denied*, 431 U.S. 954, 97 S.Ct. 2675, 53 L.Ed.2d 271 (1977); *Turner's Express, Incorporated v. NLRB*, 456 F.2d 289, 292–93 (4th Cir. 1972); *NLRB v. Metropolitan Life Insurance Company*, 405 F.2d 1169, 1178 (2d Cir. 1968).

The Board has explained the two-fold threat posed by the participation of a supervisor as follows:

> One, in situations where supervisors actively encourage employees to vote for the union and the employer takes no known stance to the contrary, the employees might be led to believe that the employer favors the union. The other conceivable effect involves the possibility that such conduct could coerce an employee into supporting the union out of fear of future retaliation by a union-oriented supervisor.

*Turner's Express, Inc.*, 189 N.L.R.B. 106, 107 (1971).

■ Inasmuch as the Company here waged a vigorous campaign against the Union, this case clearly falls within the latter category. With reference to this second ground, it is well-settled that an election is not per se invalid merely because there was some pro-union activity on the part of a supervisor. Rather, there must be a showing that the supervisor's conduct reasonably tended to have such a coercive effect on the employees that it was likely to impair their freedoms of choice in the election. *Catholic Medical Ctr. of Brooklyn, etc. v. NLRB, supra*, 620 F.2d at 22; *Turner's Express, Incorporated v. NLRB, supra; NLRB v. Alamo Express, Inc.*, 430 F.2d 1032, 1035 (5th Cir. 1970). *Cf. NLRB v. WKRG–TV, Inc.*, 470 F.2d 1302, 1315 (5th Cir. 1973); *NLRB v. American Cable Systems, Inc.*, 414 F.2d 661, 665 (5th Cir. 1969), *cert. denied*, 400 U.S. 957, 91 S.Ct. 356, 27 L.Ed.2d 266 (1970); *NLRB v. Ozark Motor Lines*, 403 F.2d 356, 359 (8th Cir. 1968), (union certification based upon an authorization card majority).

Under past Board rulings, in order to meet this required showing, it has not always been necessary that the pro-union su-

pervisor threaten to use his supervisory powers in retaliation against an employee who disfavors the union. *Delchamps, Inc.*, 210 N.L.R.B. 179, 180 (1974); *Flint Motor Inn Company, Inc., d/b/a Sheraton Motor Inn*, 194 N.L.R.B. 733, 734 (1971). However, in the absence of such a threat, the Board would appear to look to two factors in determining whether pro-union supervisory conduct had a coercive effect upon employees: (1) the degree of supervisory authority and (2) the extent, nature and openness of the pro-union activity.

Thus, in *Delchamps, Inc.*, the Board stated:

> The Hearing Officer found no credible evidence that meat department managers made threats that employees under them would not receive wage increases and would suffer other adverse treatment unless they supported the Petitioner. However, because the authorities possessed and exercised by the meat department managers are of the type which greatly affect working conditions, he found that the open support of the Petitioner by some of them would tend to restrain employees in their right not to support the Petitioner.

210 N.L.R.B. at 180.

In applying these general principles to the case before us, we preliminarily note that the determination of whether the election was tainted by the coercive effect of *pro-union* supervisory conduct is "essentially a matter of drawing inferences, and it has long been settled that an agency's conclusions based upon such inferences should not be set aside by a reviewing court unless they transgress the bounds of reason." *Catholic Medical Ctr. of Brooklyn, etc. v. NLRB, supra*, 620 F.2d at 22.

Throughout these proceedings, the Company has maintained that the groupleaders were "supervisors," that they were in the forefront of the Union's organizational efforts, that they constituted the single most effective and persuasive group of Union supporters in the Company's employ, and that the election was tainted by the coercive effect of pro-union supervisory con-

duct. Indeed, at the hearing on the challenged ballots and on the Objections to the Conduct Affecting the Results of the Election, the parties stipulated to substantial involvement by the groupleaders.

The stipulations were, *inter alia*, as follows:[7] During the critical period, i. e., the period after the filing of the representation petition seeking certification of the bargaining unit,[8] Groupleader Jackson dined with a Union Representative together with three other employees, and the Union Representative paid for the meal; groupleaders attended union meetings and invited and encouraged other employees to attend; groupleaders spoke out on behalf of the Union and frequently campaigned in favor of the Union; groupleaders told employees that, through bargaining, the Union might obtain better benefits and wages and the elimination of favoritism; groupleaders told the employees about the virtues of the UAW, including its size, structure and its involvement in the area; Groupleader Gray attended a union meeting with approximately 100 employees present, spoke about job security and indicated that she had been transferred against her wishes;[9] Groupleader Millington spoke at a union meeting with approximately 40 employees present and complained about the treatment of a relative in a job assignment; Groupleaders Gray, Smith, Johnson, Sammie Williams and Barry Williams attended an informal union meeting together with 12 other employees wherein a union attorney advised the groupleaders that, in his opinion, they were not supervisors and therefore could continue to engage in union activity, informing them that the Company was anti-union and would do everything it could to win the election; Groupleaders Gray, Johnson, Sammie Williams, Barry Williams and Smith, together with about seven other employees, attended meetings with a Union Representative in order to supply the first names of employees on the voting list, voiced their opinions on how people would vote, and volunteered to attempt to influence employees on the list whom they knew to be anti-union or whose feelings were unknown; and Gray and Barry Williams wore T-shirts bearing pro-union slogans. Also, it was stipulated that prior to the critical period groupleaders attended union meetings, solicited authorization cards from employees and passed them on to the Union. Gray and Barry Williams each obtained 3 or 4 signed cards and Sammie Williams one. Moreover, at least half of the groupleaders signed cards themselves.

In addition, the Union conceded on the record that 14 other groupleaders, making a total of 17, attended union meetings.[10]

The Hearing Officer found that there was little real dispute among the witnesses as to the supervisory authority of the groupleaders. He noted that the parties contended that all groupleaders had essentially the same employment status, responsibility, and conditions of employment. He found

---

**7.** See J.A. pp. 161–168.

**8.** *See Ideal Electric and Manufacturing Company*, 134 N.L.R.B. 1275 (1961). There the Board ruled that an election will not be set aside on the grounds of objectionable conduct occurring prior to the filing of the petition.

**9.** We quote groupleader Joanne Gray's entire speech as it is set forth in Stipulation # 14 (J.A. pp. 167–168):

Everyone had better get out and vote for the union. They transferred me to the other warehouse because someone told them I was a strong backer for the union. They said they were training me for a foreman's job, but they were just lying to me. If you don't vote for the union, you can be done the same way I was done. I worked my but[t] off for fourteen years and this is how they treat me. They jerk me up and move me without any explanation. The ones that don't vote for the union, don't come to me crying about your problems afterwards because I don't want to hear them. The company made a lot of promises after the last election, and they didn't keep them. So, there is no proof they will keep the promises they make to you now—If we don't get the union in, I don't want to hear any complaints from anybody. This is our opportunity to be able to stand up for ourselves and speak for ourselves.

**10.** Those fourteen are the following: S. Williams, B. Williams, D. Jackson, J. Carson, J. Gray, J. McNeely, B. Jackson, E. Millington, A. Smith, V. Massey, D. Abbott, T. Henley, C. Brown, and B. Jackson. (J.A. pp. 147–148).

that the groupleaders had the power effectively to recommend verbal and written warnings for misconduct and production lapses. However, he noted that generally certain other persons conceded to be supervisors and the Company's Personnel Department independently investigated the subject matter of these recommendations. The Hearing Officer further found that groupleaders had authority to direct and assign work and to transfer employees between departments and could exercise independent judgment and discretion when so doing. He found that the record failed to establish that groupleaders had any authority to grant or deny time off. Accordingly, he found all groupleaders to be supervisors within the meaning of Section 2(11) of the Act, and he recommended that the challenges to the ballots of all the groupleaders be sustained. (Of course, this sustaining of the challenges would not affect the ballot count result of the election).

In so holding, the Hearing Officer pointed out, however, that they were " 'minor supervisors' without the authority, in the interest of the Employer, to hire, fire, suspend, layoff, recall, promote, discharge, reward, or discipline employees on their own volition." (J.A. 732). He concluded that the groupleaders had very limited authority and had little or no opportunities for affecting the employment status of other employees.

The Hearing Officer further found that there was "no evidence to indicate that the groupleaders coerced or threatened employees into voting for the Union, or that any action was taken to make the employees fear possible retribution at their hands if they did not adhere to their wishes." (J.A. 734–735).

For these reasons, he concluded that the pro-union activities of the groupleaders did not impair the employees' freedoms of choice in the election or constitute interference which would warrant setting aside the election.

The Regional Director accepted the Hearing Officer's recommendation that the challenges to the ballots of only eleven of the groupleaders be sustained. His reasons for so doing were that: "The record, with regards to many of the remaining group leaders, is replete with contradictions as to their authority and responsibility. With respect to others, the record is devoid of sufficient evidence on which to make findings concerning their supervisory status." (J.A. 753).

Thus, rather than remand the case to the Hearing Officer for the purpose of resolving the conflict in testimony and making findings regarding credibility, the Regional Director chose instead to leave the status of the remaining groupleaders unresolved.

With reference to the Company's Objections to Conduct Affecting the Results of the Election as it pertained to the pro-union activities of the groupleaders, the Regional Director disposed of the issue by concluding that, assuming arguendo that the groupleaders were supervisors, they were "minor" supervisors as opposed to "major" supervisors and, hence, had no real opportunity to affect the employment status of other employees. He was thus able to make this subtle distinction despite the fact that the evidentiary contradictions and the insufficiency of evidence which he had noted had prevented him in the first place from determining whether they were supervisors at all.

With reference to the eleven groupleaders whose ballots were thrown out because the Regional Director found them to be supervisors, we note that the Regional Director went further than simply to affirm the findings of fact made by the Hearing Officer. He made his own findings that various groupleaders possessed the following indicia of supervisory authority: the authority responsibly to direct the work of employees,[11] to assign employees to vari-

11. Christine Brown, Lonnie Edlin, Richard Hayes, Carolyn Smith, Rebecca Jo Hamilton, Bobby Hobbs and Joan Carson.

ous jobs on the line,[12] to transfer employees to other lines and departments,[13] effectively to recommend written warnings to employees,[14] effectively to recommend suspensions,[15] to assign overtime,[16] and to grant time off.[17] Furthermore, he found that employees had been told that they were to follow the instructions of the various groupleaders and that the groupleaders would train them, assign them work, and enforce company rules and regulations.[18]

The Company appealed the Regional Director's decision to the Board. Review was granted only as to the issue of the challenged ballots. Upon appeal, the Board adopted the Regional Director's findings and conclusions, and, additionally, found four more groupleaders to be supervisors as they possessed the authority to adjust employee grievances, to approve overtime, to grant time off, to reassign employees to different work areas, and to issue oral warnings.

The Board left unresolved the status of the remaining eighteen groupleaders.

Our problem with this case does not lie with the Board's adoption of the primary findings of fact set forth in the decisions of the Hearing Officer and the Regional Director, or with the Board's own supplemental primary findings. These findings of fact, as far as they went, are clearly supported by sufficient evidence in the record taken as a whole. While we thus do not find fault with the Board's primary findings of fact, when we move from those primary findings of fact to the Board's conclusions of law with reference to the Company's Objections to Conduct Affecting the Results of the Election, we note that the conclusions are not supported by essential findings relative to two issues: first, whether, based upon the evidence and findings of fact reached thereon, the groupleaders or any of them who engaged in pro-union activity during the critical period were "supervisors," setting forth the criteria for such; and then, if so, whether their pro-union activity could effectively affect the votes of employees. By only looking at the groupleaders' challenged ballots the Board has thus far avoided the issue before it— that of whether any of the 175 ballots cast for the Union were affected by the groupleaders' conduct.[19] We note that all the Regional Director said in affirming the conclusions of the Hearing Officer on this issue was:

> [T]he undersigned, for the reasons stated in the Hearing Officer's Report, hereby adopts the Hearing Officer's findings and recommendations with respect to the Employer's objections. In particular it is noted, assuming *arguendo* that the group leaders involved in union activity were supervisors, they were "minor" as opposed to "major" supervisors with no real opportunity to affect the employment status of other employees. See *Admiral Petroleum Corporation,* 240 N.L.R.B. No. 122. J.A. 753.

12. Billie Hamilton, Marie Mason, Shirley Spencer, Gilbert Vickers, Rebecca Jo Hamilton, Bobby Hobbs, and Joan Carson.

13. Billie Hamilton, Marie Mason, Shirley Spencer, and Gilbert Vickers.

14. Billie Hamilton, Marie Mason, Shirley Spencer, and Gilbert Vickers.

15. Billie Hamilton, Marie Mason, Shirley Spencer, and Gilbert Vickers.

16. Billie Hamilton, Marie Mason, Shirley Spencer, Gilbert Vickers, and Joan Carson.

17. Billie Hamilton, Marie Mason, Shirley Spencer, and Gilbert Vickers.

18. Rebecca Jo Hamilton and Bobby Hobbs.

19. In limiting its review to the issue of the proper status to be awarded the challenged ballots, it can be said the Board thereby affirmed the Regional Director's decision that, even assuming all the groupleaders were supervisors, they had not engaged in conduct that would warrant setting aside the election. Section 102.67(f) of the Board's Rules and Regulations, Series 8, as amended (29 C.F.R. § 780 (1980 Ed.)) provides that "[d]enial of a request for review shall constitute an affirmance of the regional director's action which shall also preclude relitigating any such issues in any related subsequent unfair labor practice proceeding."

Such a result appears to us to be untenable in view of the scant treatment that the Regional Director gave to groupleader conduct in his findings.

The Regional Director thus repeated the bare conclusory statement of the Hearing Officer that the groupleaders were "minor" supervisors despite his own extensive supplemental findings with reference to the groupleaders' opportunities to affect the employment status and working conditions of other employees. The Regional Director does not discuss what weight, if any, he gave to his supplemental findings that the groupleaders possessed the authority to assign overtime, to grant time off, and effectively to recommend suspensions. Indeed, he provides no analysis as to the difference between "major" and "minor" supervisors and does not explain what factors he takes into consideration in arriving at this distinction.

The cases cited by the Regional Director and the Hearing Officer in their respective decisions are unenlightening. The Board's decision in the case of *Admiral Petroleum Corporation* cited by them is clearly inapposite and in no way provides authority for the conclusion that the groupleaders were but "minor" supervisors. In *Admiral Petroleum Corporation*, 240 N.L.R.B. 894 (1979), the one supervisor in question was recognized to be a major supervisor. He was found to be "in charge of employing and scheduling casual and part-time employees . . . . and would participate in the employment of fulltime employees." *Id.* at 896. He assigned work, resolved employee grievances, and granted overtime. While the Board there, by adopting the Hearing Officer's conclusions, recognized that the "degree of supervisory authority may serve to exaggerate the coercive nature of a statement by making it more likely that a threat will in fact be carried out," *Id.* at 894, it did not rest its decision on the lack of any such supervisory authority on the part of the supervisor in question. Instead, its decision

rested on the innocuous nature of the pro-union statements made by the supervisor and the rather minimal union activities in which he was involved.

The other cases cited by the Hearing Officer are the Board's decisions in *Turner's Express, Inc., supra,* and in *Diversified Products Corp.,* 199 N.L.R.B. 1024 (1972), and also those in *Gary Aircraft Corporation,* 220 N.L.R.B. 187 (1975); *Fall River House, Inc.,* 196 N.L.R.B. 74 (1972); *The Pine Cone Inc.,* 189 N.L.R.B. 569 (1971); and *Stevenson Equipment Company,* 174 N.L.R.B. 865 (1969). None of these cases are helpful in shedding light on the meaning of the major supervisor/minor supervisor distinction. In none of the latter four cases did the Board go beyond the mere conclusory statement that the supervisors involved in union activities were "minor" and it made no specific findings of the various indicia of supervisory authority. Moreover, those cases as well as *Diversified Products Corp.* can be distinguished from the case before us in that in all of them, in contrast to the pro-union activity found here, there was only minimal pro-union activity by the supervisors during the critical period.

In *Turner's Express, Inc.,* as well, the Board made no findings and set forth no indicia of supervisory authority but rested its decision on the bare assertion that the supervisors were "minor," and, as such, concluded that there was no reasonable basis for believing that fear of supervisory retaliation destroyed the employees' freedoms of choice in the election. The decision in *Turner's Express, Inc.,* however, was reversed by the Fourth Circuit in *Turner's Express, Inc. v. NLRB,* 456 F.2d 289 (4th Cir. 1972),[20] where the Court found the Board's designation of the two supervisors as "minor" to be unsupported by the evidence and the law.[21]

**20.** The Board's certification decision in *Turner's Express, Inc.* came before the Fourth Circuit upon appeal of the Board's subsequent Decision and Order on a refusal to bargain charge which is reported at 192 N.L.R.B. No. 89.

**21.** The Court there held: "The Board's designation of Robbins and Tebo as 'minor supervi-

sors' is not supported by the evidence or the law. The Act does not grade supervisors as major or minor." 456 F.2d at 291. We note that the *Turner* case differs from the case before us in that that case presented clear evidence of supervisory threats of retaliation against employees voting against the union.

In an apparent attempt to bring this case within the strictures of *Diversified Products Corp., supra,* and *NLRB v. Decatur Transfer & Storage, Inc.,* 430 F.2d 763 (5th Cir. 1970) the Hearing Officer states in his Report and Recommendations that "... it is a long-established principle that if an employer is aware of a supervisor's union activities and then stands idly by, the employer may not subsequently rely on the supervisor's conduct for setting aside the election." (J.A. 736). While this is an accurate statement of the law, it has no application here. Here, prior to the election the Company had requested a ruling from the Board upon the status of the groupleaders, and here, as a result of the Regional Director's failure to resolve the issue at that point, the Company, if the groupleaders should subsequently be determined not to be supervisors, was precluded from then interfering with their pro-union campaign activities for fear that such interference would constitute an unfair labor practice.

■ Moreover, we cannot agree with the Hearing Officer when he states that the fear of supervisory retaliation is "... unlikely in circumstances where an employee recognizes that any maltreatment or punishment by a supervisor predicated upon the employee's opposition to the union can be brought to the attention of higher management officials who share the employee's views on unionization." (J.A. 735). Rather, we are in agreement with the Third, Fourth and Fifth Circuits which have rejected the attitude of higher management toward the union as a factor which is determinative of the issue of the coerciveness of supervisory participation in the union campaign. *NLRB v. Handy Hardware Wholesale, Inc., supra,* 542 F.2d at 938; *NLRB v. Boyer Brothers, Inc.,* 448 F.2d 555, 564 (3d Cir. 1971), *cert. denied,* 409 U.S. 878, 93 S.Ct. 132, 34 L.Ed.2d 132; *NLRB v. Heck's Inc.,* 386 F.2d 317, 322 (4th Cir. 1967). As stated in *Handy Hardware Wholesale, Inc.,* a case which was cited with approval by this Circuit in *Catholic Medical Ctr. of Brooklyn, etc v. NLRB, supra,* 620 F.2d at 22 (2d Cir. 1980):

It has frequently been held that the participation of a supervisor in a union election undermines the "laboratory conditions" necessary for an unfettered choice. [Citations omitted] .... This is true even if the employer, as here, openly urged the defeat of the Union, since the supervisor might well be able to recommend if not actually cause the dismissal or other adverse treatment of the employee, disguising the true motives of the recommendation in innumerable ways. The likelihood of such occurrences is less important than the possibility that an employee might fear such retribution and act accordingly.

542 F.2d at 938.

Most importantly, the Board has made no attempt to either distinguish or reconcile the record before it in this case with its decisions in the similar cases of *Delchamps, Inc., supra,* and *Flint Motor Inn Company, Inc., d/b/a Sheraton Motor Inn, supra.*

In *Delchamps* the employer contended prior to the election that its meat department managers were supervisors. Contrary to the employer's contention, the Regional Director found them to be employees and refused to exclude them from the voting unit. The employer's request for review of the Regional Director's decision was denied by the Board. Following the election, won by the union, the employer filed objections to the election, reiterating its contention that the meat department managers were supervisors, and arguing that the election should be set aside because of the managers' extensive involvement in the union's organizing campaign. The Regional Director overruled the employer's objections. The Board, however, granted review and ordered a hearing on the issue of those objections.

Following that hearing, the Board acknowledged that the agency had erred in its determination, prior to the election, that the meat department managers were not supervisors. The Board found that the meat department managers possessed the authority to assign and direct work, to schedule, to train and to evaluate meat

department employees in the performance of their respective tasks, to grant time off, to select employees for overtime, to reprimand and to discipline employees, and to recommend pay raises, transfers, promotions and discharges, and that there was evidence that some of the managers hired and fired employees.

As to the alleged objectionable conduct, the Board found that:

> ... the meat department managers joined and supported the Petitioner from the beginning of its campaign to organize the employees involved and continued their active and open support through the "critical period." Many of them joined the Petitioner and solicited employees under them to join. Four or five of them were on the Petitioner's organizing committee established prior to the filing of the petition. They distributed, solicited signatures to, and collected cards for the Petitioner. They attended and urged employees to attend union meetings. They wore union pins and urged employees to vote for the Petitioner.

*Id.* at 180.

Although there was no credible evidence that the meat department managers made threats that employees under them would suffer adverse treatment unless they supported the union, the Board concluded that their activities in support of the union had such a pervasive effect upon the employees' freedoms of choice as to require that the election be set aside.

So, too, in *Flint Motor Inn Company*, where the one supervisor involved was found to possess the authority to hire, to train, to discipline, to schedule work, including overtime work, to supervise the Employer's kitchen staff, and to reprimand waitresses, the Board concluded that, despite the absence of threats to use supervisory authority to punish those who did not support the union "... given [his] considerable supervisory authority and his active and outspoken support of the Union throughout the organizational campaign, there is a reasonable 'possibility that [his] conduct could coerce an employee into sup-

porting the union.'" (citing *Turner, supra*), 194 N.L.R.B. at 734.

■ It is true that in the case before us the groupleaders possessed no authority to hire, to fire, or to promote employees, or to issue written warnings on their own volition, but there is voluminous testimony in the record, albeit at times conflicting, as to their authority effectively to recommend such action. In light of the above-mentioned danger that supervisors bent on retaliation could indeed disguise their true motives in recommending that adverse action be taken against an anti-union employee, we do not believe that this distinction sufficiently sets this case apart from the factual circumstances upon which the *Delchamps* and *Flint* cases rest. And yet, despite much evidence in the record, no findings of fact were made evaluating these several indicia of supervisory authority. Surely such adjudications are crucial before the Board can fairly reach the conclusion that the groupleaders involved here are "minor" supervisors. Moreover, the Board cannot be allowed to circumvent its obligation to explain its departure from clear precedent simply by failing to make the necessary factual determinations which would bring a case within the bounds of precedent. See *NLRB v. Metropolitan Life Insurance Company*, 380 U.S. 438, 442–443, 85 S.Ct. 1061, 1064, 13 L.Ed.2d 951 (1965); *Marco Sales Company v. F.T.C.*, 453 F.2d 1, 7–8 (2d Cir. 1971).

Due to the lack of specific findings and articulated reasons for the distinction between this case and the cases of *Delchamps* and *Flint*, the Board's action cannot properly be reviewed by this Court.

The Board in its presentation to us now attempts to set our case apart from these above-discussed cases by attempting to qualify its findings as set forth above by characterizing the authority of the groupleaders as "largely ministerial," limited to bringing problems to the attention of higher management, and "limited by the routine nature of the work." (Brief for the Board, pp. 14–15). No such limitations of authori-

ty are delineated in the opinions of the Regional Director, the Hearing Officer, or the Board, which would now permit such characterizations of the various indicia of supervisory authority stated in the record as found to exist by them. Moreover, this Court cannot now accept appellate counsel's post-hoc rationalizations for the disparate treatment in these cases. *See NLRB v. Metropolitan Life Insurance Company*, 380 U.S. at 444, 85 S.Ct. at 1064; *NLRB v. Columbia University*, 541 F.2d 922, 931 (2d Cir. 1976).

Were we the decision-makers in this case, we ourselves might be inclined to infer from the record that the type of day-to-day authority over employees which the group-leaders possessed would warrant our holding that the retaliatory potential of the groupleaders is sufficient to make their extensive involvement in the union campaign coercive upon the employees. However, the determination of the coercive effects of groupleader participation in the election campaign must initially lie with the Board, inasmuch as this is an issue the adjudication of which is clearly committed in the first instance to the agency. "For reviewing courts to substitute counsel's rationale or their discretion for that of the Board is incompatible with the orderly function of the process of judicial review." *NLRB v. Metropolitan Life Insurance Company, supra.*

Reversed and remanded to the Board for further proceedings and action in the light of the content of this opinion.