Richard J. ROTH, Acting Regional Director of Region 29 of the National Labor Relations Board, and on Behalf of the National Labor Relations Board, Petitioner,

v.

AMERICAN PROPERTY RIGHTS ASSOCIATION FUEL OIL BUYERS GROUP, INC., Prudential Transportation, Inc., and Amer–National Heating Service, Inc., Respondents.

No. 91 CV 2441.

United States District Court,
E.D. New York.

May 27, 1992.

Saundra B. Rattner, N.L.R.B., Brooklyn, N.Y., for petitioner.

Lionel Alan Marks, New York City, for respondents.

## ORDER

KORMAN, District Judge.

After a de novo review of the record and after hearing extensive oral argument, I adopt in full the recommendation of Magistrate Carter as set out at pages 601–602 of his carefully considered and exhaustive Report and Recommendation dated April 3, 1992.

The Clerk is directed to enter a judgment embodying the foregoing recommendations.

SO ORDERED.

## REPORT AND RECOMMENDATION

ZACHARY W. CARTER, United States Magistrate Judge:

Petitioner, Acting Director of Region 29 of the National Labor Relations Board

("Board"), moves pursuant to § 10(j) of the National Labor Relations Act ("Act"), as amended, 29 U.S.C. § 160(j), for an injunction pending final disposition before the Board of consolidated complaints, filed before and after a contested union election, which allege conduct constituting unfair labor practices in violation of §§ 8(a)(1) and 8(a)(3) of the Act, 29 U.S.C. §§ 158(a)(1) and (a)(3).

American Property Rights Association Fuel Oil Buyers Group, Inc. ("APRA"), Prudential Transportation, Inc. ("Prudential") and Amer–National Heating Service, Inc. ("Amer–National") hereinafter collectively referred to as Respondent, operating as a single, family-owned, integrated enterprise, supply home heating oil and related services to residential customers. Petitioner alleges that respondents engaged in a campaign of coercion, threats, interrogations, surveillance, unlawful promises, discriminatory discharges and other unfair labor practices designed to discourage employee support for the organizing efforts of Local 553, International Brotherhood of Teamsters, Chauffeurs, Warehouseman and Helpers of America, AFL–CIO ("Union"), and to affect the outcome of a Board directed union election. Petitioner seeks an order 1) enjoining respondents from engaging in unfair labor practices; 2) reinstating or preferentially recalling all employees unlawfully discharged and 3) imposing an interim bargaining order requiring respondents to recognize the Union as the representative of respondent's employees for purposes of collective bargaining.

Respondents deny the unfair labor practice allegations and contend that participation by one or more supervisors in the Union's organizing campaign prevented the Union from achieving clear majority support.

This petition was filed on July 3, 1991 and was thereafter referred to me for a report and recommendation. At a July 18, 1991 conference before me, the parties stipulated that the record of the hearing conducted by the Administrative Law Judge (ALJ) on the consolidated complaints pending before the Board would constitute the record upon which this petition would be decided. The ALJ conducted six days of hearings beginning August 14 and concluding August 21, 1991. The ALJ rendered his written decision on November 8, 1991. Thereafter, petitioner requested time to file exceptions to the ALJ decision. Petitioner and respondent submitted memoranda, including copies of exceptions to the ALJ's decision and supporting legal memoranda, through December. 27, 1991.

Upon this record and for the reasons set forth below, I recommend that the petition for a preliminary injunction be granted in part and denied in part.

### I.

§ 10(j) of the Act permits the Board to petition the district court following issuance of a complaint "for appropriate temporary relief or restraining order." The district court is authorized to grant such relief as it "deems just and proper."

The Second Circuit Court of Appeals held in *Kaynard v. Mego Corp.*, 633 F.2d 1026 (2d Cir.1980), that the court on a Section 10(j) application for a preliminary injunction must determine " 'whether there is reasonable cause to believe that unfair labor practices have been committed and, if so, whether the requested relief is ... just and proper ...' " *Id.* at 1030 (quoting *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1051 (2d Cir.1980)). The *Mego* court further stated that "the regional Director's version of the facts should be sustained if within the range of rationality" and "inferences from the facts should be drawn in favor of the charging party." *Id.* at 1031. Moreover, "on issues of law, 'the district court should be hospitable to the views of the General Counsel, however novel.' " *Id.* at 1031 (quoting *Danielson v. Joint Board of Cost, Suit and Allied Garment Workers' Union, I.L.G.W.U.*, 494 F.2d 1230, 1245 (2d Cir.1974)).

In a similar vein, as respondents urged at oral argument and in their memorandum of law, the court should take into consideration the credibility findings of the ALJ, inasmuch as the ALJ has had the opportunity to observe the demeanor of the wit-

nesses, and this court has not. (*See*, Transcript of Proceedings dated November 7, 1991, pp. 34–36; Memorandum of Respondent with regard to Extraordinary Remedies, p. 2.) Indeed, it is the well-established policy of the Board "not to overrule an administrative law judge's credibility resolutions unless the clear preponderance of all relevant evidence convinces [the Board] that they are incorrect." *PHT, Inc. d/b/a Polynesian Hospitality Tours, et al.*, 1989 WL 224485, 1989 NLRB LEXIS 687; 133 L.R.R.M. 1213 (1989) citing *Standard Dry Wall Products*, 91 NLRB 544 (1950), *infd.*, 188 F.2d 362 (3rd Cir.1951). And when the Board's findings are based on the ALJ's assessment of the credibility of the witnesses, they will not be "overturned unless they are 'hopelessly incredible' or they 'flatly contradict either' the 'law of nature' or 'undisputed documentary testimony.'" *NLRB v. Gordon*, 792 F.2d 29, 32 (2d Cir. 1986), quoting *NLRB v. J. Coty Messinger Service, Inc.*, 763 F.2d 92, 96 (2d Cir.1985).

Bearing these principles in mind, I now turn to a review of the hearing record and the findings of the ALJ.

## II.

During the summer and fall of 1990, William Ness, the Union's president and business agent, made contact with several of respondent's drivers in an attempt to revive an organizing effort that had failed the preceding summer because of a language barrier between him and respondent's largely Spanish-speaking employees. Ness was repeatedly told by the employees with whom he spoke that Vasilios "Billy" Varkos was the person he had to talk to if he was going to be successful in organizing respondent's workers. (T. 43–44)[1]. Ness gave his business card to one of respondent's drivers and asked him to deliver it to Zarkos. (T. 45).

In the fall of 1990, Zarkos was in his second period of employment with respondents. Zarkos was originally hired by respondents as an oil delivery man or "driver" in 1985. In 1987, the brothers Robert and Vincent Latora, the principal owners and managers of respondents, were each convicted of charges arising out of attempts to unlawfully evict a residential tenant and sentenced to one-year jail terms. The Latoras placed Zarkos in charge of the garage in their absence. In that capacity, according to Zarkos, he assigned delivery jobs to the drivers and truck maintenance jobs to the mechanics. He could hire employees, but could not fire them unless specifically authorized to do so by Linda "Susana" Wong, Vincent Latora's wife and president of APRA, one of the respondent companies. (T. 317). Zarkos remained in charge of the garage until June 1988, when he was fired by Wong for allegedly stealing from the company. (T. 319). It is stipulated by the parties that during his first period of employment, Zarkos was a supervisor within the meaning of the Act. (ALJ 7).[2]

In November 1989, shortly after the Latoras were released from jail, Robert Latora asked Zarkos to return to work for respondents. (T. 341–342). According to Zarkos, Robert initially told him that he would be engaged as a driver at a salary of $550 per week. Instead, according to Zarkos, he was employed as a dispatcher at $500 per week. In that capacity, again according to Zarkos, it was his job to assign deliveries to the drivers. Zarkos claims he could not hire employees. However, on the possibly mistaken belief that he could fire employees for disciplinary reasons, he "fired" a driver, Ismael Medina, only to see him immediately reinstated by Vincent Latora. Zarkos says that he was admonished by Vincent Latora that he did not have the authority to fire anyone. Zarkos acknowledged that he did "reprimand employees", but that "all other authority that [he] used to have [during his first period of employment] was given back to Vinnie and Bob." (ALJ 8).

Respondents through their witnesses dispute Zarkos' modest description of his duties during his second period of employ-

---

1. "(T. ___)" refers to the transcript of proceedings before the ALJ.

2. "(ALJ ___)" refers to the ALJ's decision dated November 8, 1991.

ment, although perceptions differed among the witnesses as to exactly what authority Zarkos possessed. Patrick Novillo, one of respondent's managers, testified that Zarkos was the manager for oil deliveries with the power to hire and fire. (T. 871). Jesus Campos, one of respondents drivers, believed that Zarkos held the title of "manager," but never saw him "discipline, promote, transfer, lay off, recall or reprimand" anyone. (ALJ 8, quoting Campos Affidavit to the Board). Ismael Medina, the driver whom Zarkos attempted to "fire" in a dispute over a missed delivery, testified that "Billy's not my supervisor, just my dispatcher. He just gave me my [delivery] tickets, that's all." (ALJ 9; T. 519). However, when Zarkos told him he was fired, Medina left work for two days, returning only to pick up his paycheck, apparently believing at the time that he had in fact been fired by Zarkos. A job description prepared by respondent's chief accountant in August, 1990, following an interview with Zarkos, characterized Zarkos as the "transportation manager," whose duties included the hiring and discharge of drivers and hiring and supervision of truck mechanics. The job description also provided that Zarkos was responsible for negotiating salaries with drivers and making periodic salary adjustments. (ALJ 9–10). Nelson Zuleta, Miguel Marques, Amarillo Rosa and Nelson Cuesta all testified that they were hired by Zarkos during this second period of employment. (T. 960; 1071; 846). The ALJ ultimately found, "[w]ith some hesitation," that during his second period of employment, Zarkos was a supervisor within the meaning of the Act. (ALJ 19). Petitioner did not include a challenge to this ruling amongst his formal exceptions to the ALJ's decision.

Returning now to the summer and fall of 1990, prior to any contact he eventually had with the Union, Zarkos engaged in conversations with many of respondent's English speaking employees about their working conditions, specifically their "long hours" and "inadequate pay." In these conversations Zarkos repeatedly expressed the view

that the employees needed a union. (T. 371–372; ALJ 5). And in a conversation with at least one fellow worker, Ismael Medina, he discussed delaying any union organizing effort until the busier winter heating season for maximum impact. (T. 493).

At some point thereafter, a driver who had met Ness, the union organizer, delivered Ness' business card to Zarkos. In about October 1990, Zarkos called Ness. During their conversation Ness asked Zarkos to arrange for him to meet with respondent's employees at some place removed from respondent's facility. Zarkos chose his girlfriend's bakery. A meeting was set for November 15, 1990. Zarkos told the English-speaking employees about the meeting. Luz Muniz, a clerical employee, informed the Spanish-speaking employees about the meeting. (ALJ 6).

Ness arrived at the meeting accompanied by a Spanish interpreter and two of the Union's business agents. (T. 49) In addition to Zarkos and Muniz, eight other employees attended the meeting: Nelson Zuleta; Heriberto Echevarria; Alberto Guzman; Pedro Guzman; Jesus Campos; Bernardo Campos; Angel Marquez and Pedro Santana. Ness addressed the group through the Spanish interpreter.

Ness asked if any of the employees present was a supervisor. (T. 52) He did not define or explain the term supervisor to the group. By his own definition, a supervisor was someone whose job it was "[t]o follow company direction, give out orders for the company ... he supervises to make sure the work is done period." (T. 78–79). He was not aware of any legal definition of the term supervisor, and he did not use the term "supervisor" within the meaning of the Act. (T. 79). He specifically asked Zarkos if he was a "supervisor" and Zarkos indicated that he was not. (T. 80) (ALJ 6). On the authorization card he signed, Zarkos identified himself as a "dispatcher," as did Muniz and Demaris Gomez. (GC 2–A' 2–E. 3–D) [3]. According to Luz Muniz, Ness asked "[i]f any of us was in charge, you know, of anything like supervisor or

---

**3.** "(GC )" refers to an exhibit in the proceeding    before the ALJ.

managers." She said no one answered "[b]ecause everyone there was a truck driver or either mechanics ... [o]r a dispatcher." (T. 194–195).

Ness explained the benefits of working under a union contract, including welfare benefits, pension, annuities, sick time and better wages. (T. 50). Ness then handed out and explained the union authorization cards. (T. 51). The cards stated (in English) "I hereby authorize [the Union] to be my exclusive representative for purposes of collective bargaining." The Spanish interpreter translated and explained the cards for the benefit of the Spanish-speaking employees. No one else addressed the meeting. (T. 75). All ten employees signed the authorization cards.

Nelson Zuleta, a driver still employed by respondents at the time he was called by respondent to testify before the ALJ, claimed that Zarkos, not a Union representative gave him his card and told him to sign it. (T. 966–973). But in an affidavit to the Board Zuleta stated that he received his card from one of the union representatives. He variously testified that he signed the card because he was afraid that he would be fired by Zarkos or that he had signed voluntarily. (T. 966–973).

As the meeting concluded, Luz Muniz, Alberto Guzman and Pedro Guzman asked Ness for additional authorization cards to be circulated amongst the employees who could not attend because of their work schedules. (T. 114) (ALJ 6). Ness gave them the cards, but cautioned them that the cards could not be executed on respondent's time or premises and that no pressure should be exerted on anyone to sign the cards. (ALJ 6) (T. 53–54).

On the day following the meeting, Muniz took the blank authorization cards to respondent's offices and talked to each of the employees there. She explained to them what Ness had said about the union the night before. In response "everybody" said they wanted to sign a card. (T. 114–115). According to Muniz, she collected signed authorization cards from Santos Santana, Mohammed Kwara, Edgar Romaro, Damaris Gomez, Antonio Coronel, Ra-

mon Lajura, Victor Benavides, Abdul Karim Atrach and Ismael Medina. (T. 115). According to one of these nine employees, Kwara, he received his authorization card from Zarkos, who, along with Muniz and Patrick Novillo, one of respondent's managers, told him it would be "good" to sign. (T. 1018). In their testimony before the ALJ, Gomez, Medina and Benavides supported Muniz' claim that they received their cards from her. (T. 249–250; 546; 494). Rosario recalled that he received his authorization card from Muniz, but Muniz believed that Rosario obtained his card from Guzman. (T. 114; 692–693). No one else among these nine employees testified before the ALJ. Pedro Santana testified that he believed he received his card from Muniz on November 16th rather than at the meeting on November 15th. (T. 792). According to Muniz she also obtained a signed authorization card from Margie McClain, but is undisputed that McClain was a supervisor within the meaning of the Act. The only employees who were not given authorization cards were Jose Monta and Emily Williams.

Muniz offered an authorization card to respondent's manager, Novillo, but he declined to sign it "since he was living in one of the Latora's buildings" and "didn't want to get into trouble ..." (T. 117). According to Novillo, Zarkos had previously asked him about joining the Union. When he responded that managers could not join, Zarkos purportedly told him "not to worry about it because he already talked to the guy of the Union, and, you know, as far [sic] as we say that we are dispatchers, everything is going to be right." (T. 873). At one point in his testimony Novillo stated that it was he who had asked Atrach, Romaro and Coronel to sign the authorization cards, but under further examination, he retreated from that position, claiming only that he had told them "it's okay ... to sign the card" in response to their questions concerning whether they might be fired if they did not sign the cards. (T. 885–886).

After Muniz collected all of the signed authorization cards, she gave them to Pe-

dro Santana who took them to the post office and mailed them. (T. 116).

Based on the authorization cards collected, on December 26, 1990 the Union filed a petition with the Board for certification as the representative of a bargaining unit of respondent's employees consisting of all full-time and part-time drivers, serviceman, dispatchers and mechanics, but excluding supervisors, office clericals, guards and all other employees. Ultimately, the Regional Director certified the Unit as requested and directed that an election be held on March 6, 1991. Respondents, most specifically, Robert Latora, received a copy of the petition on December 31, 1990. Gomez, respondent's receptionist, signed for the certified mail delivery of the petition on that date and immediately showed it to Muniz. Both had been expecting it. Gomez saw Robert Latora pick up the large yellow envelope containing the petition and take it back to his office. (ALJ 10; T. 260–262). Robert Latora testified that he first discovered the Union's petition on January 2, 1991 when he found the opened envelope and enclosed letter on the copying machine in respondent's office. (T. 1091–1092). The ALJ found Robert Latora not to be a credible witness, on this specific issue, and generally. Crediting the testimony of Muniz and Gomez, the ALJ concluded that respondents became aware of the petition on December 31, 1991. (ALJ 16, 17).

During the weeks that passed between the November 15th meeting and the delivery of the petition to respondent's offices, several employees spoke openly about the Union to Novillo. Indeed, Novillo seemed to encourage support for the Union. (T. 884–887). At various times, Novillo promised that he would not tell the Latoras about the organizing efforts of the employees, reassuring them that he would not "rat" on them. (ALJ 10; T. 794).

As far as Novillo knew, the Latoras never became aware of any Union activity before December 31, 1991. (ALJ 11; T. 887). On this point, the ALJ found Novillo's testimony credible. (ALJ 17). Margie McClain, a supervisor, also knew about the Union's campaign, but there is no evidence that she informed the Latoras. McClain did not testify before the ALJ. Ultimately, the ALJ concluded that there was no direct evidence that respondents became aware of any Union activity prior to their receipt of the Union's petition on December 31, 1990. (ALJ 17).

Beginning on or immediately after December 31, 1990 respondent's principals, the Latora brothers and Wong, embarked on a heavy-handed campaign against the Union. According to Jesus Campos, on December 31, 1990, he received a phone call from Vincent Latora at about 11:00 p.m. Vincent Latora had never before called him at home. Latora told Campos that two other employees had admitted to him that they had attended the Union meeting. Latora told Campos that these employees had "asked forgiveness" and that he had forgiven them. Latora advised Campos to tell him everything he knew about the Union,— "[w]ho had called the Union, who had signed the card, and who had been present at that meeting." (T. 410). Latora warned Campos that he would be fired if he did not provide this information. Latora reminded Campos that he had a family to support. He also stated that Campos was a good driver and that he didn't want to lose him. Latora told Campos to think the matter over. (T. 410–411).

A few days later, Robert Latora called Campos into his office where he and brother Vincent again attempted to persuade Campos to answer their questions about the Union organizing effort. (T. 413). The Latoras said they would pay more money than the Union promised. They warned him that he would lose his job if the Union came in. When Campos continued to deny knowledge of the Union, they offered him a paper to sign. The document, which was in English, read as follows:

"I _____ the undersigned, an employee of Prudential Transportation, Inc. state that I have not petitioned, nor signed any petition or card requesting Local 553–I.B.I.–AFL–AFL–CIO to represent me for purposes of collective bargaining.

If Local 553–I.B.I. AFL–CIO has filed any card with the NLRB bearing my signature for the purpose of representing me in support of any petition for collective bargaining, I hereby state that my signature was obtained through misrepresentation, fraud or duress by my supervisory employee, William Zarkos under threat and implication of losing my job, and that it is not my intention to have Local 553–I.B.I.–AFL–CIO file a petition for collective bargaining for me, and I hereby revoke any such authority.

Sworn to before me this

———— day of January 1991

————————

————————

Notary Public

Campos, who had difficulty understanding written English, asked what the document said. He was told that the paper said "[s]imply that you do not know anything about the union." According to Campos, he signed the document because he was afraid he would be fired if he did not. (T. 413–414). Campos testified that it was not his intention to renounce the Union by signing the document. (T. 414). Thereafter, Campos told several of his co-workers that he had been forced to sign the document and recounted his conversation with the Latoras. (T. 415). Under circumstances detailed below, Campos was terminated one month later.

In addition to Campos, Victor Benavides and Alberto Guzman were also called into the offices of respondents, interrogated about the Union and told to sign the affidavits. (T. 553; 629). Each testified that they signed the affidavits only to save their jobs. (T. 556; 629). Guzman testified that there was a general awareness among the employees that individuals were being called in to sign the documents renouncing the Union. Apparently because of the physical layout of respondents offices, Guzman's co-workers could see him signing the affidavit. (T. 631). Guzman himself knew that other workers had signed before him. (T. 553; 629–636). While the hearing record suggests that several other employees signed the affidavit under similar circumstances, a firm number was not established. Among those who signed only Campos, Benavides and Guzman were called by either side to testify concerning the affidavits.

In his version of the events surrounding the renunciation affidavits, Robert Latora described a legally hygienic process charted by his attorney. Latora claimed that he and his attorney were informed by Ariella Bernstein, a Board agent, that in order for respondents to challenge the authorization cards, respondents would have to obtain signed notarized affidavits from its employees. Latora claims Bernstein instructed respondent's attorney with respect to the content of the affidavits. Thereafter, respondent's attorney prepared and faxed to Latora a blank form affidavit to be retyped, reproduced and distributed among respondent's employees. (T. 1096–1097). According to Latora, an announcement was made to all employees, in Spanish and in English, that affidavits were available by which they could revoke their support for the Union if they had signed or been forced to sign an authorization card with which they did not agree. The affidavits were then left in two areas of the office for respondent's drivers, mechanics and servicemen. (T. 1100). Latora then passively sat in his office, notary at the ready, and "waited ... for the people to come in individually ... to sign the Affidavits. No one told them to enter the office." (T. 1100–1103; 1157). Latora never actually saw any of the employees sign the documents because he was busy at his desk. He denied making any threats or promises to induce employees to sign the affidavits. (T. 1157–1169). Regional Counsel denied respondent's request for a subpoena for the testimony of Board agent Bernstein, finding that her testimony would not be "relevant." Consequently her version of these events was not heard by the ALJ (R ex. 11; Respondent's brief p. 22).

Meanwhile, on January 1, 1991, Vincent and Robert Latora, along with their brother John, had visited Zarkos at his girlfriend's bakery. Vincent and Robert Latora asked Zarkos "[w]ho started this mess."

Zarkos replied that he didn't know. According to his testimony, Zarkos was then asked, "How much you want for you stop no being in the union?" to which he replied, "I don't want money now. You no give me money all this time I work for you, a raise [sic]. I work extra hours, everything, you never give me for overtime, never pay me extra. And I don't want now, and I can't stop the union now." The Latoras told him that he was fired. As a seeming afterthought, they mentioned that he had had problems with oil spills. (T. 330–331). The following day he told Luz Muniz that he had been fired. During the week following his termination he told other co-workers as well (T. 333). In the weeks following his discharge, Zarkos had regular contact with Ness. It was principally through Zarkos that Ness contacted respondent employees to attend and vote in the election. These workers told Zarkos that the Latoras were calling employees into their offices to sign a document renouncing their support for the union under threat of discharge. (T. 333).

Robert Latora testified that Zarkos was fired because he had a bad attitude and because the delivery trucks in his charge were constantly in disrepair. Latora further claimed that he believed Zarkos was sabotaging respondent's delivery trucks. He based this claim on a report from one of his painters, Miguel Marquez, who stated that an unidentified employee, allegedly working under the direction of Zarkos, was purposely leaving the tires loose on the delivery trucks. (T. 1088–1090; 1070–1075). The ALJ found Zarkos more credible than Latora. (ALJ 19).

On January 2, 1991, Wong called Luz Muniz into her office. Wong asked Muniz what she knew about the Union. Muniz told Wong that she knew nothing. (ALJ 11; T. 126–128). Wong called Vincent Latora into her office and told him that Muniz was not being cooperative. According to Muniz, Vincent Latora told her that Novillo and Marques had already told him about the Union. Vincent then wrote down the names of employees whom he knew to have attended the November 15th meeting, in an apparent attempt to impress her that the employees' activities had been under surveillance. (ALJ 11, T. 128). Wong told Muniz that this was Muniz' last day with respondents. Muniz asked for and received her paycheck. When she was leaving, Robert Latora stopped her and tried to convince her to disclose what she knew about the Union, but she again refused. (T. 129–130). Robert Latora then told Muniz to return to work, remarking "... you're not my enemy." (ALJ 20; T. 132). Muniz returned to work and finished the day.

When Muniz reported to work on the following day, a co-worker, Emily Williams, told her that she should sit next to Muniz so that she could learn specific aspects of Muniz' job, particularly, the processing of automatic oil delivery tickets. (ALJ 20; T. 139–140). She also testified that Robert and Wong hovered near her desk in a manner that was uncharacteristic. Later that day, Robert called Muniz into his office and again questioned her about the Union. She refused to talk about it. Wong then approached her and in the presence of Robert and Vincent Latora handed her a paycheck. Wong told Muniz to "take two weeks off ... until everything settles down." (ALJ 20; T. 141). At the end of two weeks, Muniz called Wong. Wong told her to take one more week. After another week Muniz called respondent's offices and spoke to Vincent Latora. He advised Muniz that business was slow and that she should go to the unemployment office. (ALJ 21; T. 145). According to Muniz, she was never told by Robert or Vincent Latora or Wong that she was being terminated because of any dissatisfaction with her job performance. (ALJ 21; T. 146).

Robert Latora testified that Muniz was fired, in part, because of an "attitude" problem that had manifested itself over the preceding months. Latora claimed that Muniz never mastered the computerized delivery ticket system and that as a result, customers either ran dry or received multiple deliveries. He also complained that Muniz had once advised a customer to take her business elsewhere if she were not satisfied with respondent's prices. (T.

1133–1135). The ALJ credited Muniz' testimony over that of Robert Latora and concluded that she was terminated because of her union activities. (ALJ 21).

Within a day or two of December 31, 1990, Vincent Latora asked another of respondent's drivers, Ismael Medina, what he knew about the Union. Latora warned Medina that if the Union got in they would force out all of the employees and replace them with Union drivers. (ALJ 14; T. 502). On January 3, 1991 Medina was called into an office where he met with Robert Latora and Wong. Latora told him that a review of "delivery tickets" indicated that the number of daily deliveries he, made was "good, but not good enough." Medina was told that he was fired because of his "productivity." Medina had received a raise just one month before, apparently in reward for his "productivity." (ALJ 24–25; T. 505–510).

On February 3, 1991, at about 9:30 a.m., Patrick Novillo told Victor Benavides, a boiler mechanic, that he was no longer needed "because work [was] slow." Benavides asked Novillo directly whether he was being fired because of the Union. Novillo insisted that he was only being terminated because business was slow. No other reason was offered. Curiously, according to Benavides, he had worked until 8 p.m. in the evening on the preceding day. (ALJ 26; T. 558–560). In his testimony, Benavides acknowledged that in December 1990 he was involved in a service mishap that resulted in a customer's basement being flooded with oil. He stated that he was not at fault, and he was neither reprimanded nor fired. (T. 588–592). In a later incident a customer asked him to perform a service for which he did not have a tool. He left to obtain a tool. Before he could return, the customer called respondent's offices and another serviceman was dispatched to perform the task. (T. 595–598). Benavides was not immediately terminated in connection with this incident either. Before the ALJ respondents claimed that Benavides was terminated for incompetent work, intoxication on the job, unauthorized use of respondent's vans, causing damage to customer's property, failing to respond to radio calls and failing to complete his assigned work. The ALJ found these reasons to be pretextual. (ALJ 26). Testimony of several of respondent's employees firmly established that respondent's "policy" against employees taking respondent's vans home was never enforced. As noted above, the ALJ found Robert Latora to be a witness generally lacking in credibility. (ALJ 16). The ALJ found that the record established such clear anti-union animus on the part of respondents that the timing of Benavides' discharge, coming only one month after respondents learned of the union's activities, supported the conclusion that he was terminated because of his support for the union. (ALJ 26).

As mentioned earlier, Alberto Guzman, one of respondent's mechanics, was called into respondent's offices and required to sign an affidavit renouncing the Union. Guzman recalled that he signed the document on January 8, 1991. (T. 629). Almost one week later, on January 14, 1991, Guzman was terminated. According to Guzman, on January 13, 1991 he responded to a call for assistance from one of respondent's truck drivers who had two flat tires. When he arrived at the scene in respondent's van, he was not equipped to change the tires inasmuch as he only had a jack to lift the trunk. Guzman informed Vincent Latora that a "lift truck" was needed and one was sent. Guzman went directly home with respondent's van and pushed it on the street. (T. 637–639). According to Guzman, on the following morning, he discovered that the van was missing. He went to work and told Vincent Latora what had happened. Latora told him he had already been informed by the authorities that the van had been recovered. Latora sent Guzman to retrieve the van. Guzman went to the location where the van was located, but upon observing police officers at the scene, left without speaking to them or attempting to tow the van. Guzman attributed this strange behavior to the fact that he had no drivers license. When Guzman returned, Vincent gave him a final paycheck along with a letter, drafted for Guzman's signature, which purportedly explained the

reasons for Guzman's discharge. Specifically, the letter stated that he was being terminated because of "unsatisfactory performance and alcohol problems on the job" about which he had been repeatedly warned but in which he persisted. The letter also acknowledged that Guzman took the van without permission, drove drunk and "crashed" the van. Guzman was told to sign the letter. Guzman did so, but he testified that he did not fully understand it. At the bottom of the letter Guzman wrote in Spanish that he did not know if the document was true. Guzman claims that Vincent Latora crumpled the letter and threw it into the garbage. Guzman retrieved it. The letter, containing the handwritten notation in Spanish, was introduced at the hearing. (GC 9) (ALJ 28; T. 643, 661–675).

Robert Latora testified that Guzman "resigned" immediately upon returning to respondent's offices after failing to recover the wrecked van. Latora testified that Guzman refused to answer any questions about the van and simply demanded his last paycheck. (T. 1124–1125). Latora contends that on the day that Guzman was sent to assist the driver with the two flat tires, he was described by the driver as having been "dead drunk." Latora claims that the tow truck driver who removed the wrecked van reported having observed Guzman in possession of a bottle of vodka and also having seen a bottle inside of the wrecked van. (T. 1121–1123). Ultimately, the ALJ found Latora's testimony with respect to the vodka bottle to be implausible, and found further that there was no direct proof to support respondent's claim that Guzman wrecked the van. (ALJ 28–29).

On January 14, 1991, Robert Latora called Demaris Gomez into a back office. Gomez had been hired as a receptionist in November 1990. According to Gomez, she was never told that her position was temporary. In her testimony, she acknowledged having some difficulty with the new phone system that had been installed but she insisted that respondents had never complained about any problems prior to January 14th. On that day, however, she was told by Robert Latora that there were complaints that the phone was not being answered. Latora handed her a check for the prior weeks pay and for the day of January 14th, signifying that she had been terminated. Just prior to handing her the check, Robert Latora asked Gomez if she had spoken to Muniz who had been terminated almost two weeks before. (ALJ 22; T. 272–274). Robert Latora testified that Gomez was hired only temporarily until the new phone system was operating properly. The ALJ did not find Latora's testimony credible in spite of the fact that Gomez was never replaced. In his view, the timing of the discharge provided a basis for concluding that Gomez' was fired because she supported the Union. (ALJ 22).

On or about February 4, 1991, approximately one month after he was forced to sign the affidavit renouncing the Union, Campos was called into Robert Latora's office and told to take a week's "vacation" because business was slow. Campos testified that work was not slow during this period, although in his affidavit to the Board he indicated that "business [was] a lot slower ..." during that year. (ALJ 22; T. 456–461). When Campos asked why he, a senior driver, was being asked to be furloughed first among all the drivers, Robert Latora told him he had been working a lot and needed rest. After a week, Campos sought to return to work. Robert Latora told him to take another week off. When Campos asked why another driver was not asked to take a week instead, Latora said that it was because Campos wanted the Union. (ALJ 22–25; T. 425). Eduardo Torres, the manager who replaced Zarkos, testified that he set up a rotating furlough system for the drivers in which each driver would take off a week at a time during slow periods and that this winter was particularly slow. He claimed that he asked Campos to return to work after his one week furlough but that Campos refused because respondent would not pay him for the week he was out. (ALJ 23; T. 1046–1053). The record established that six drivers were hired during this "slow" period. (ALJ 24).

In a series of conversations from February 18 to March 4, 1991, Robert told Campos that he would only take Campos back as an independent contractor. Under this arrangement, respondent would pay Campos a set price per gallon of gasoline, but Campos would have to purchase an oil truck. Respondent indicated that he would finance the purchase of the truck, but Campos indicated that he did not have the funds to support such an enterprise. Robert Latora testified that this independent contractor proposal had its genesis in settlement discussions aimed at rehiring some of the employees who had been discharged in order to settle the unfair labor practice complaints that by this time had been filed with the Board. Latora suggested that respondent was searching for a lawful way of reinstating Campos without appearing to favor him in exchange for his vote against the Union, in possible further violation of the Act. However, the contract tendered to Campos contained a clause renouncing union participation. (T. 1106–1110; ALJ 24). Campos continued to ask Robert Latora to rehire him as a salaried employee. Finally, on March 4, 1991, two days prior to the election that had been directed by the Board, Latora told Campos he would give him his job back if he voted against the Union on March 6th. In his testimony, Robert Latora denied having any conversation with Campos concerning the Union. The ALJ found that incredible. (ALJ 24). Nor did the ALJ credit Torres' testimony that Campos voluntarily declined to return after his one week "furlough". The ALJ concluded that Campos was discharged in violation of the Act. (ALJ 24).

Pedro Guzman was hired by respondent as a boiler mechanic or "serviceman" on or about November 2, 1990. According to Guzman, he maintained an independent business with his own customers at the same time that he worked for respondent. Novillo testified that there were numerous complaints from customers that Guzman installed used parts and equipment. It was respondent's policy to use new parts only. On December 31, 1990, Margie McClain told him that there was no more work for him and handed him a letter, signed by Patrick Novillo, that specified the reasons he was being terminated. In sum, the letter cited complaints from customers that he failed to make repairs, noted that he took a service van home without permission and that he failed to report to work on the preceding day without calling respondent. Guzman testified that he was not aware of any customer complaints. Indeed, he claimed that on two occasions he was required to correct service work done by Novillo. However, the ALJ found Guzman's claimed lack of awareness of any customer complaints to be incredible. Moreover, the ALJ found credible Novillo's testimony that the four servicemen, including Guzman, discharged between October, 1990 and January 3, 1991 were fired for a combination of their poor performances and for increased efficiency. None of the four servicemen discharged were replaced. (ALJ 30–31; T. 874–882). Pedro Guzman was never subjected to any interrogations or threats. He was made no promises relating to union activities and he was never asked to sign the renunciation affidavit. (ALJ 31).

Pedro Santana, the son of Pedro Guzman, was also one of respondent's servicemen. Santana was hired on or about October 15, 1990 and was fired on November 17, 1990. Santana testified that Vincent Latora and Wong warned him that unless he started working faster, he would be fired. Inasmuch as Santana was fired before the date that the credible evidence established that respondent's learned about the Union's campaign, the ALJ concluded that Santana was not discharged in violation of the Act. (ALJ 31).

Efrain Rosario, another serviceman, was hired on October 27, 1990 and discharged on November 24, 1990. Rosario acknowledges that before he was fired the Latoras warned him about driving with non-employees in the service van. He also conceded that he was involved in a minor accident in one of respondent's vans. Novillo testified that he received customer complaints about Rosario's job performance and that Rosario often failed to maintain radio contact with the office so that his whereabouts would be

known. Like Santana, Rosario was fired prior to December 31, 1990, the date that respondents first became aware of the Union's campaign. Consequently, the ALJ concluded that he was not discharged in violation of the Act. (ALJ 32).

On March 6, 1991, a Board supervised election was conducted. Five (5) votes were cast in favor of the Union and seven (7) were cast against the Union. Thirteen ballots were challenged, enough to affect the outcome of the election. Timely objections were filed by the Union, and together with the challenges and complaints were all referred for the within described hearing before the ALJ.

Based on the hearing record, the ALJ concluded that respondents committed numerous violations of § 8(a)(1) of the Act by engaging in unfair labor practices including 1) interrogating employees concerning the Union campaign; 2) interrogating employees about their union sympathies and the union activities of their fellow employees; 3) threatening to fire employees for failing to disclose their Union activities; 4) offering raises and additional vacation pay to its employees if they would withdraw their support from the Union; 5) directing and assisting its employees to sign affidavits withdrawing their support for the Union; 6) threatening to cease operating the company if the Union was certified as the employees' representative; 7) offering to reinstate an employee to his former job if he voted against the Union in the Board election; 8) interrogating its employees about the leaders of the Union campaign among the employees; and 9) creating the impression amongst its employees that their Union activities were under surveillance by respondent.

Further, the ALJ found that respondent violated § 8(a)(1), (3) of the Act by terminating the employment of Muniz, Gomez, Campos, Medina, Benavides and Alberto Guzman because of their membership in and activities on behalf of the Union. In reaching this conclusion, the ALJ found that Zarkos was a supervisor within the meaning of the Act and, consequently, not protected under § 8(a)(1), (3). The ALJ

also found that Muniz and Gomez were properly included in the bargaining unit, notwithstanding their clerical responsibilities, because they shared a community of interest with the rest of the bargaining unit. The ALJ rejected petitioner's claim that Pedro Guzman was discharged in violation of § 8(a)(1), (3), finding that the evidence supported respondent's claim that he would have been terminated even absent any Union activity. With respect to Pedro Santana and Efrain Rosario, the ALJ found that they had been discharged prior to December 31, 1990, the date on which the ALJ found that respondents became aware of the Union campaign. Consequently, there was no evidence to support petitioner's claim that these two employees were discharged because of their Union activities.

The ALJ recommended that the challenges to the ballots of Muniz, Gomez, Campos, Medina, Benavides and Alberto Guzman be overruled and that those ballots be opened and counted. The ALJ recommended that the challenges to the ballots of Zarkos, Pedro Guzman and Pedro Santana be sustained.

Among other remedies, the ALJ recommended the imposition of a bargaining order under *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), requiring respondents to recognize the Union as the representative of its employees for collective bargaining purposes. In support of his recommendation, the ALJ found that the record established that at the time the authorization cards were signed the Union had clear majority support inasmuch as the Union had signed cards from sixteen of the nineteen employees that legally constituted the bargaining unit. The ALJ further found that Zarkos, although a supervisor, did not play a sufficiently significant role in the organizing campaign to taint the Union's clear majority support among respondent's employees. Finally, the ALJ found that the bargaining order was warranted by the "outrageous" and "pervasive" unfair labor practices disclosed by the record, including the discharge of nearly one-third (six) of the bargaining unit employees. The ALJ recommended that respondents be required to

offer Muniz, Gomez, Campos, Medina, Benavides and Alberto Guzman immediate reinstatement to their former positions, or if those positions are no longer available, to substantially similar positions, without prejudice to their seniority rights. The ALJ would also require respondents to make these six discriminatees whole for any lost wages suffered as a result of their unlawful discharges.

After a "full evaluation of the ALJ's decision," petitioner no longer seeks interim reinstatement of Vasilios Zarkos, Pedro Santana, Efrain Rosario or Pedro Guzman, pursuant to § 10(j) of the Act, having determined that such relief would not be "just and proper." (Counsel for Petitioner's letter memorandum, dated November 27, 1991).

## DISCUSSION

§ 8(a)(1) of the Act provides that an employer may not "interfere with, restrain or coerce employees in the exercise of rights guaranteed under § 7 [rights to self-organize, join unions and bargain collectively]." 29 U.S.C. § 158(a)(1). Section 8(a)(3) proscribes discrimination in "[hiring] or tenure of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3).

Section 10(j) of the Act empowers the Board, upon issuance of a complaint charging any unfair labor practice, "to petition any United States District Court, within any district wherein the unfair labor practice in question is alleged to have occurred ..., for appropriate temporary relief or restraining order." 29 U.S.C. § 160(j).

■ On this petition for an injunction under § 10(j) of the Act, this court must determine whether the record developed before the ALJ provides reasonable cause to believe that unfair labor practices have been committed and, if so, whether the requested relief is "just and proper." *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1051 (2d Cir.1980). *See also Seeler v. Trading Port, Inc.*, 517 F.2d 33, 36–37 (2d Cir.1975).

■ "Reasonable cause", for § 10(j) purposes, exists when the Regional Director "has come forward with evidence sufficient to spell out a likelihood of violation." *Danielson v. Joint Board of Coat, Suit, & Allied Garment Workers Union,* 494 F.2d 1230, 1234 (2d Cir.1974), quoting *Douds v. Milk Drivers and Dairy Employees Union,* 248 F.2d 534, 537–38 (2d Cir.1957). The district court need not find that "an unfair labor practice occurred, or that the precedents governing the case are in perfect harmony, but only that there is 'reasonable cause to believe that a Board decision finding an unfair labor practice will be enforced by the Court of Appeals.' " *Kaynard v. Mego Corp.,* 633 F.2d 1026, 1030. Where there are disputed issues of fact "the Regional Director is entitled to assume facts and draw inferences in favor of the charging party, and, as long as his choice is rationally based and the court is not convinced that the Board's legal position is wrong, the court must sustain those findings and grant injunctive relief." *Danielson v. International Organization of Masters, Mates and Pilots,* 521 F.2d 747, 751 (2d Cir.1975).

■ The hearing record amply supports a reasonable cause belief that respondent engaged in numerous unfair labor practices closely mimicking conduct that has been held by the Second Circuit to constitute classic violations of §§ 8(a)(1) and 8(a)(3) of the Act, 29 U.S.C. § 158. In sum, the credible evidence establishes reasonable cause to believe that respondents engaged in coercive interrogations, threats to discharge, discriminatory discharges, threats to cease operations, demands to sign documents renouncing the Union, promises of benefits and the creation of the impression of surveillance of union activity. (*See Kaynard v. MMIC, Inc.,* 734 F.2d 950 (2d Cir. 1984), finding each of the aforementioned practices to constitute violations of the Act.)

### § 8(a)(1) Violations

■ The record clearly establishes that Muniz was subjected to hostile questioning by the Latoras and Wong concerning her

participation and that of other employees in the Union organizing campaign. Muniz was shown a list purportedly containing the names of employees who had attended the Union's organizational meeting. When she declined to provide to respondents information about the Union, she was characterized as "uncooperative." The ALJ found Muniz' testimony on this issue credible and found Latora's denials to be implausible. Consequently, the ALJ concluded that Muniz was subjected to interrogation and was given an impression of surveillance in violation of § 8(a)(1) of the Act. The record supports that conclusion.

■ Campos likewise testified that he was interrogated about the Union. The Latoras visited Campos at his home on the same day that the Union's election petition was received by respondent. The Latoras demanded that Campos tell them all he knew about the Union campaign on pain of losing his job. The ALJ found Campos' testimony credible, and concluded that he had been interrogated in violation of § 8(a)(1) of the Act. That conclusion finds a rational basis in the record.

■ The hearing record also established that Campos, Benavides and Alberto Guzman were required by respondent to sign an affidavit renouncing the Union. Each testified that he was threatened with the loss of his job if he declined to sign the affidavit. Each testified that he was called individually, questioned about the Union and told to sign the affidavit. The ALJ did not find credible Robert Latora's testimony that he played a passive, "ministerial" role in proffering the renunciation affidavits to these three employees and others. *See Central Washington Health Services Association*, 279 NLRB 60. Moreover, the record discloses that the employees were called into respondents offices in a manner likely to have an impact on other employees present. Witnesses testified to observing the traffic in and out of respondent's offices on the day these affidavits were presented. The ALJ found that respondent's actions in connection with the renunciation affidavits violated § 8(a)(1) of the

Act, and the record supports that conclusion.

There was hearing testimony that respondent, chiefly through Robert and Vincent Latora, threatened to shut down operations if the Union came in (told to Campos and Guzman) and that the Union would replace respondent's employees with its own drivers, displacing the present employees (told to Campos, Medina and Guzman). Robert Latora denied these allegations, but the ALJ did not find him credible. The record provides a rational basis for the ALJ's conclusion that these acts violated § 8(a)(1).

■ Finally, the ALJ found credible Campos' testimony that on March 4, 1991, two days prior to the Board directed election, Robert Latora promised Campos reinstatement and two weeks paid vacation in exchange for his vote against the Union. This act clearly violated § 8(a)(1) of the Act.

### § 8(a)(3) Violations

■ In order to establish that an employee has been discharged in violation of § 8(a)(3), petitioner must first make a *prima facie* showing sufficient to support the inference that the employer's opposition to the Union was a motivating factor in the employer's discharge decision. Once this *prima facie* showing has been made, the burden will shift to the employer to produce credible evidence that "the discharge would have taken place irrespective of the anti-union motive." *NLRB v. Wright Line, etc.*, 662 F.2d 899, 905 (1st Cir.1981). In essence, once petitioner has made a *prima facie* showing, respondent must come forward with evidence of a "good" reason for the discharge. *Id.*

■ The credible evidence supports petitioner's allegation that Muniz was discharged because of her pro-union activities and not for any "good" or legitimate business reason. As stated above, the ALJ found credible evidence that Muniz was subjected to interrogation, given an impression of surveillance and subjected to closer than normal supervision in violation of § 8(a)(1) of the Act. Against the backdrop

of these acts, Muniz was told "to take two weeks off ... until everything settles down." Later, when she inquired about returning to work she was advised to visit the unemployment office. The ALJ found Robert Latora's claim that Muniz was fired because of unsatisfactory job performance to be pretextual, both in light of the timing of the discharge, the respondent's manifest anti-union animus and the relatively minor nature of respondent's alleged complaints about Muniz work. With respect to the credibility of Robert Latora's testimony generally, the ALJ observed: "to say that he was hostile, evasive, uncooperative, sarcastic and arrogant would not capture the full flavor of his testimony." (ALJ 16). Even the cold record tends to support this assessment. Consequently, the ALJ's conclusion that Muniz' discharge violated § 8(a)(3) has a rational basis in the record.

■ Campos was also invited to take a week off, purportedly as a part of a rotating furlough program of respondent's drivers. The ALJ credited Campos' claim that he repeatedly offered to return to work but was declined reinstatement. Viewed in the context of the interrogation, threats and renunciation affidavit he was forced to sign, and combined with the timing of his termination, it was rational for the ALJ to conclude that the explanation offered by Robert Latora was pretextual. The hearing record revealed that at respondent's offices, an invitation to take time off, in this context at least, was a euphemism for "you're fired!" The ALJ's finding that Campos was discharged in violation of § 8(a)(3) of the Act is supported by the record.

The ALJ found that Medina was discharged on or about January 3, 1991 after being questioned about the Union. Medina was warned that the Union would bring in its own workers to replace respondent's employees. According to Medina, Robert Latora remarked in firing him that the volume of his deliveries was "good, but not good enough." Robert Latora testified that Medina was fired because he was making too few deliveries. The ALJ concluded that there was a rational basis for this § 8(a)(3) allegation, in light of his assessment of Latora's credibility and the timing of Medina's discharge. The ALJ's conclusion that petitioner sustained his initial burden of establishing an § 8(a)(3) violation and that respondents did not meet their burden of producing credible business-related reasons for the discharge was within the range of rationality.

■ As described above Benavides was subjected to questioning concerning the Union and required to sign a renunciation affidavit under threat of discharge. He was terminated by Novillo ostensibly because work was slow. Robert Latora testified that Benavides often left tools in customers' basements and seldom had the tools needed to complete a service job. In addition, respondent claimed that Benavides was often intoxicated, caused damage to customers property and failed to respond to radio calls. He was not immediately disciplined or terminated in connection with these transgressions, however. Based on what the ALJ found to be manifest anti-union animus and the fact that he had earlier been subjected to previously described unfair labor practices, the ALJ concluded that the petitioner had sustained his burden of establishing a § 8(a)(3) violation and that respondent did not prove that the reasons for the discharge it offered were non-pretextual. In light of the clearly established § 8(a)(1) violations committed against Benavides, the ALJ's conclusion that he was discharged in violation of § 8(a)(3) is not outside the range of rationality.

■ The discharge of Alberto Guzman presents a closer question. According to respondent Guzman wrecked one of their service vans while he was intoxicated. The details of the incident are recited above. *Infra.* at 21–23. The ALJ expressed serious reservations about the coherence of Guzman's account of the incident. The ALJ could point to no part of respondent's version of the events that was inconsistent with the available evidence or logically implausible. The circumstantial evidence, including that of Guzman's bizarre behavior at the time of the incident, could reason-

ably have lead respondents to the conclusion that Guzman had a serious accident in one of their vans while driving drunk. Respondent has clearly produced evidence sufficient to establish a good business-related reason for Guzman's discharge. *NLRB v. Wright Line, etc., supra,* 662 F.2d at 904. The ALJ's general assessment of Robert Latora's credibility provides an insufficient basis upon which to conclude that Guzman would not have been discharged but for his union activity, particularly in light of Guzman's own evasive and inconsistent testimony. *Id.* at 903. It is likely that the Board will find that the ALJ's credibility finding in this instance is overcome by a preponderance of the evidence. *See Standard Dry Wall Products, supra.* Consequently, I must conclude that the record does not provide a rational basis for finding that Alberto Guzman's discharge violated § 8(a)(3) of the Act.

Demaris Gomez, a receptionist, testified that she was discharged on January 14, 1991. Respondent claims she was hired temporarily to bridge some difficulties with a new phone system. Gomez states that she was never told that she was hired on a temporary basis. Gomez testified further that in the same conversation in which Robert Latora told her she was fired, he smirkingly asked her whether she had spoken recently to Muniz who had been fired some ten days earlier. The ALJ interpreted this sly reference to Muniz as a subtle hint to Gomez that she was being discharged for the same reason as Muniz. This nuance was one that the ALJ was uniquely in a position to glean from his observations of the witnesses' demeanors. Applying its traditional standard, it is unlikely that the Board will disturb the ALJ's finding in this regard, resting as it does on his subjective impression of the relative credibility of the witnesses on this issue. See *Standard Dry Wall Products,* 91 NLRB 544 (1950), infd. 188 F.2d 362 (3rd Cir.1951). Consequently, the ALJ's finding that Gomez' discharge violated § 8(a)(3) is within the range of rationality.

By letter dated November 27, 1991, petitioner declared that he no longer believes that the interim reinstatement of Pedro Santana, Efrain Rosario, Pedro Guzman and Vasilios Zarkos is "just and proper." The ALJ determined that Santana and Rosario were discharged prior to the date on which respondent learned about the Union activity. The ALJ found that the non-discriminatory reasons offered by respondent for Guzman's discharge were not pretextual. The ALJ concluded that Zarkos was a supervisor at the time of his discharge and, therefore, not protected under § 8(a)(3) of the Act.

*The Requests for Injunctive Relief*

On a petition for an injunction for § 10(j) relief, inquiry does not end once unfair labor practices are established. § 10(j) relief may only be ordered if under the circumstances presented such relief would be "just and proper." *Kaynard v. Palby Lingerie, Inc., supra,* 625 F.2d at 1051. Petitioner requests four general categories of relief: 1) reinstatement or preferential recall of employees discharged in violation of § 8(a)(3) ("discriminatees"); 2) lost wages for discriminatees; 3) a cease and desist order specifically proscribing unfair labor practices and requiring certain remedial measures to be taken by respondent; and 4) a bargaining order requiring respondent to recognize the Union as the representative of its employees for purposes of collective bargaining.

In *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 614, 89 S.Ct. 1918, 1940, 23 L.Ed.2d 547 (1969), the Supreme Court authorized the use of bargaining orders in cases in which "the union had a card majority at one point but was later confronted with employer unfair labor practices tending to 'undermine majority strength and impede the election process.'" *Seeler v. The Trading Port, Inc.,* 517 F.2d 33 (2d Cir.1975), quoting *Gissel,* 395 U.S. at 614, 89 S.Ct. at 1940. *Gissel* recognized that in such a case, an order directing the employer to cease and desist from *future* unfair labor practices would be ineffective since the damage would already have been done. In that situation, "perhaps the only fair way to effectuate employee rights is to re-establish the conditions as they existed before

the employer's unlawful campaign." 395 U.S. at 612, 89 S.Ct. at 1939.

The Second Circuit has repeatedly cautioned, however, "that a bargaining order is an extraordinary and drastic remedy, is not favored, and should only be applied in unusual cases." *NLRB v. Coty Messinger Service, Inc.*, 763 F.2d 92, 99 (2d Cir.1985). " 'The clearly preferred remedy for violation of the Act is an election.' *NLRB v. Marion Rohr Corp.*, 714 F.2d 228, 230 (2d Cir.1983). This preference 'reflects the important policy that employees not have union representation forced upon them when, by exercise of their free will, they might choose otherwise.' " *Coty, supra* at 99. *See NLRB v. Gordon*, 792 F.2d 29 (2d Cir.1986); *NLRB v. Pace Oldsmobile, Inc.*, 739 F.2d 108, 110 (2d Cir.1984).

As interpreted by the Second Circuit, *Gissel* authorizes the imposition of bargaining orders in two categories of cases. In the first category are those " 'exceptional' cases marked by 'outrageous' and 'persuasive' unfair labor practices." *See Coty*, 763 F.2d at 99. "[W]hen the Regional Director makes a showing, based on authorization cards, that the union at one point had a clear majority and that the employer then engaged in such egregious and coercive unfair labor practices as to make a fair election virtually impossible ..." a bargaining order is warranted without any inquiry into alternative remedies. *Seeler v. Trading Port, Inc., supra* 517 F.2d at 40. *Kaynard v. Palby*, 625 F.2d 1047 (2d Cir.1980). *NLRB v. Coty, supra*, at 99.

The second category of cases would be those "less extraordinary cases marked by less pervasive practices" where the court should "take into consideration the extensiveness of an employer's unfair labor practices in terms of their past effect on election conditions and the likelihood of their recurrence in the future." If the court finds "that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and the employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order, then such an order should issue." *NLRB v. Jamaica Towing, Inc.*, 632 F.2d 208, 212

(2d Cir.1980), quoting *Gissel*, 395 U.S. at 614–15, 89 S.Ct. at 1940.

The Second Circuit has provided substantial guidance in determining which sorts of unfair labor practices belong in which *Gissel* category. With respect to "Category I" violations, the Court held as follows:

"Certain violations have been regularly regarded by the Board and the courts as highly coercive. These are so-called 'hallmark' violations and their presence will support the issuance of a bargaining order unless some significant mitigating circumstance exists. They include such misbehavior as the closing of a plant or threats of plant closure or loss of employment, the grant of benefits to employees, or the reassignment, demotion or discharge of union adherents in violation of § 8(a)(3) of the Act."

*NLRB v. Jamaica Towing, Inc.*, 632 F.2d 208, 212–13 (2d Cir.1980) Concerning "Category II" violations, the Court states:

"In contrast to the hallmark unfair labor practices just catalogued, which justify a bargaining order, there is an array of less serious violations which must either be numerous or coupled with some other factor intensifying their effect before they fall within *Gissel's* second category and support an order to bargain. These include such employer misconduct as interrogating employees regarding their union sympathies, holding out a "carrot" of promised benefits, expressing anti-union resolve, threatening that unionization will result in decreased benefits, or suggesting that physical force might be used to exclude the union. In such cases the Board may not pressure an adverse effect, lasting or otherwise, upon the employees' free choice."

*Id.* at 214.

■ The hearing record clearly establishes that respondent engaged in unfair labor practices that fall in both *Gissel* categories. Turning first to the category I violations, the credible evidence established a rational basis for concluding, as the ALJ found, that respondent discriminatorily discharged Luz Muniz, a strong union adherent and authorization card signer, Jesus

Campos, a card signer, who declined to answer respondent's inquiries about the Union, and Demaris Gomez and Hector Benavides, who demonstrated their union support by signing authorization cards. There was substantial evidence that respondent's principals repeatedly threatened employees with closing the business if the union was successful.

With respect to Category II violations under *Gissel,* the record just as clearly established that respondents engaged in interrogations, promises of benefits, and expressions of anti-union resolve.

■ The determination that respondent engaged in Category I violations does not conclude the matter, however, for purposes of deciding the appropriateness of an interim bargaining order. It is the law of this Circuit that even where Category I violations are established, the Regional Director must make "a showing, based on authorization cards, that the union at one point had a *clear* majority." (emphasis added). Moreover, a prudent exercise of the authority to enter an interim bargaining order must give due consideration to the interests § 10(j) was enacted to protect. As the Second Circuit has observed, *Gissel* held that "when a union loses its majority as the result of employer unfair labor practices, it is essential not to freeze the present situation, but rather to 're-establish the conditions as they existed before the employer's unlawful campaign.' *Seeler v. Trading Port, Inc.,* 517 F.2d 33, quoting *Gissel,* 395 U.S. at 612, 89 S.Ct. at 1939. [S]ection 10(j) was intended as a means of preserving or restoring the status quo as it existed before the onset of the unfair labor practices." *Id.*

The difficult question presented by the record in this case is whether "the conditions as they existed before the employer's unlawful campaign," reflect an exercise of free choice on the part of a clear majority of respondent's employees in support of the Union. To the largest extent, this question turns on the impact of the participation of respondent's supervisor, Zarkos on the Union's organizing campaign.

Having withdrawn his request for the reinstatement of Zarkos on the grounds that such relief would not be "just and proper," petitioner in effect concedes that Zarkos was a "supervisor" within the meaning of the Act during the period of the Union's organizing campaign. However, a brief review of the authorities on this issue is warranted insofar as it bears on whether the Union achieved clear majority support, untainted by Zarkos' participation.

§ 2(11) of the Act, 29 U.S.C.A. § 152(11) defines a "supervisor" as

> any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

Supervisors under the Act not entitled to the protections of the Act. *NLRB v. Metropolitan Life Insurance Company,* 405 F.2d 1169, 1172 (2d Cir.1968).

■ The courts have interpreted § 2(11) as establishing a two-pronged test for determining whether an individual is a supervisor under the Act. It must be determined 1) whether the individual exercises or possesses the authority to exercise, any of the powers enumerated in the statute, and 2) whether such possession or exercise of authority involves the use of independent judgment. *NLRB v. Metropolitan Life Insurance Company,* 405 F.2d 1169, 1173, 1178 (2d Cir.1968); *N.L.R.B. v. Harmon Industries, Inc.,* 565 F.2d 1047, 1049 (8th Cir.1977); *NLRB v. Metropolitan Petroleum Company,* 506 F.2d 616, 618 (1st Cir.1974). Respondent has the burden of proving that Zarkos was a supervisor. *Hicks Oil & Hicksgas, Inc.,* 293 NLRB No. 10, 91 (1989).

■ With respect to the first prong of the test, "just the possession of any one of the listed powers is sufficient to cause the possessor to be classified as a supervisor even if the power is not customarily exer-

cised." *Metropolitan Life Insurance Company,* 405 F.2d at 1173. *Harmon Industries, Inc.,* 565 F.2d at 1049; *Metropolitan Petroleum,* 506 F.2d at 618. Patrick Novillo testified that Zarkos had the same managerial responsibilities during the second period of employment as he had during the first period of employment. (T. 870, 871, 891).

As noted earlier, Zarkos retained the power to hire and possibly to fire during his second term of employment: Cuesta, Zuleta, Marquez and Rosa testified that Zarkos hired them (T. 846, 960, 1070, 1128); Zarkos admitted that he fired driver Ismael Medina although his decision was reversed (T. 334, 360, 496, 517); Zarkos admitted that he told an NLRB investigator that he had the power to hire and fire (T. 393–394); Jesus Campos testified that Zarkos assigned the deliveries to the drivers and Campos heard that Zarkos had the authority to hire and fire, although he never saw Zarkos exercise that authority (T. 452). Based on these and other examples from the record, it is clear that Zarkos exercised or possessed at least one of the supervisory functions listed under § 2(11).

■ The independent judgment requirement is conjunctive, so that the exercise or existence of any one of the enumerated statutory powers, combined with independent judgment, makes one a supervisor. *Walla Walla Union–Bulletin v. NLRB,* 631 F.2d 609, 613 (9th Cir.1980); *Harmon Industries, Inc.,* 565 F.2d at 1049. *In NLRB v. Metropolitan Petroleum,* the First Circuit reversed a Board decision and found that oil dispatchers were supervisors, not employees, based on the following job description: "plan[ning] the day's deliveries in the most economical fashion, bearing in mind the customer requirements, the driver requirements, the available delivery equipment, the time required for delivery, and the experience of the driver." 506 F.2d at 618. Similarly, the Board classified a distributor's warehouse foreman as a supervisor, albeit a low level supervisor, when he performed many of the same tasks as other employees, but in addition was responsible for getting trucks out on time. *Orlando Paper Company,* 197 NLRB 380 (1972). In another matter before the Board a dispatcher who has a degree of independent authority in establishing and assigning delivery routes was classified as a supervisor. *Cal Western Transport,* 283 NLRB 453 (1987).

■ In sum, Zarkos possessed or exercised authority, using independent judgment, with respect to at least one of the enumerated functions listed under Section 2(11) of 29 U.S.C. § 152. As a result, it must be concluded that Zarkos was a supervisor under the Act.

"It is well-established that the participation of a supervisor in a union election may in some circumstances so undermine the employees' freedom of choice as to warrant setting the election aside." *ITT Lighting Fixtures, Division of ITT Corp. v. NLRB,* 658 F.2d 934, 936, citing *Catholic Medical Ctr. of Brooklyn etc. v. NLRB,* 620 F.2d 20, 22 (2d Cir.1980); *NLRB v. Handy Hardware Wholesale, Inc.,* 542 F.2d 935, 938 (5th Cir.1976), *cert denied,* 431 U.S. 954, 97 S.Ct. 2675, 53 L.Ed.2d 271 (1977); *Turner's Express, Incorporated v. NLRB,* 456 F.2d 289, 292–93 (4th Cir.1972); *NLRB v. Metropolitan Life Insurance Company,* 405 F.2d 1169, 1178 (2d Cir. 1968).

It has been held that "mere supervisor participation in a union's organizational campaign does not necessarily warrant setting aside an election" but that such participation may require that result where "(1) the employees may be led to believe the supervisor was acting on behalf of the employer and that the employer favors the union; and (2) employees could reasonably have been coerced out of fear of future retaliation by union-oriented supervisors into supporting the union." *Catholic Medical Ctr. of Brooklyn, etc. v. NLRB, supra,* 620 F.2d at 22. Clearly in light of respondent's vigorous campaign against the Union, this case belongs in the second category, if any.

In cases falling under this second category, it is well-established that an election is not *per se* invalid because there was some degree of pro-union activity by a supervi-

sor. *ITT Lighting Fixtures, etc. v. NLRB,* 658 F.2d at 937. "Rather, there must be a showing that the supervisor's conduct reasonably tended to have such a coercive effect on the employees that it was likely to impair their freedom of choice in the election." *Id.* Direct proof that a supervisor threatened to use his supervisory powers in retaliation against an employee who disfavors the Union is not necessary. *Id.* at 937, citing *Delchamps, Inc.,* 210 NLRB 179, 180 (1974). In the absence of such a threat, however, two factors will be considered in determining "whether pro-union supervisory conduct had a coercive effect upon employees: (1) the degree of supervisory authority and (2) the extent, nature and openness of the pro-union activity." *ITT Lighting Fixtures, etc., supra* at 937.

As the Board stated in *Cal–Western Transport,* 283 NLRB 453 (1987), "in evaluating whether a supervisor's pro-union conduct could reasonably tend to coerce employees' votes in a representation election, it is necessary to evaluate the ability of a supervisor both to reward and to retaliate against employees." What must be undertaken is a "complete analysis of the extent of supervisory authority." *Id.*

It must be noted in applying these principles governing the issue of supervisory taint, that to the extent that any such determination is a matter of drawing inferences, the Regional Director's conclusion based on "'such inferences should not be set aside by a reviewing court unless they transgress the bounds of reason.'" *ITT Lighting Fixtures, etc. v. NLRB, supra,* 658 F.2d at 937, quoting *Catholic Medical Ctr. of Brooklyn, etc. v. NLRB, supra,* 620 F.2d at 22.

A review of the hearing record provides a rational basis for concluding that Zarkos enjoyed a measure of authority sufficient in and of itself to have a coercive effect on employees' exercise of free will in deciding whether or not to support the Union. Moreover, the credible evidence establishes that Zarkos played an active role in the Union's campaign. Ness, the Union's agent, considered Zarkos indispensable to his organizing effort. Before Zarkos made contact with Ness, he was vocal in his views that respondent's workers needed a union. Zarkos went so far as to suggest to Medina that they delay any organizing effort until the busiest part of the heating season in order to gain a strategic advantage. When Ness enlisted Zarkos' help in setting up an organizational meeting, he selected a place many of respondent's employees knew to be the business establishment of Zarkos' girlfriend. At least one employee who attended the organizational meeting claimed to have received his authorization card from Zarkos. Zarkos himself testified that he had repeated conversations with his co-workers concerning the Union up to and continuing after the day he was discharged. Ness testified that during the period between the filing of the petition and the election, Zarkos was his principal point of contact with respondent's employees. Ultimately, it was Zarkos who contacted respondent's employees and got them to attend the representation election.

Nor can there be any doubt grounded in reason that Zarkos was perceived to have substantial supervisory authority over his co-workers. Several employees testified that they were hired by Zarkos. Zarkos had the discretion to give certain employees days off. He believed that he had the power to fire employees for disciplinary reasons. The record amply supports the conclusion that Zarkos' supervisory status at the very least places in doubt whether respondent's employees exercised their franchise free of concern from retaliation from a pro-union supervisor.

In *Delchamps, Inc., supra,* there was no direct evidence that any supervisor made threats to employees serving under them that they would be adversely treated if they failed to support the Union. However, "because the authorities possessed and exercised by the meat department managers are of a type which greatly affect working conditions, he found that the open support of the [union] by some of them would tend to restrain employees in their right not to support the [union]", 210 NLRB at 180; *See ITT Lighting Fixtures, etc., supra,* 658 F.2d at 937. Zarkos undoubtedly possessed and exercised compa-

rable authority. While it seemed to be the nature of this family operation that Zarkos and others could periodically fall in and out of favor, the credible evidence clearly establishes that *vis a vis* the drivers, mechanics and servicemen, Zarkos continuously was a person of substantial authority.

Inasmuch as Zarkos' participation in the Union campaign places in doubt whether there was ever clear, unfettered majority support for the Union, an interim bargaining order cannot be regarded as a "just and proper" remedy.

The participation of Zarkos in the organizing campaign is not the only factor that places in doubt whether the Union ever enjoyed "clear" majority status.

The ALJ determined that as of December 31, 1990, the Union had valid authorization cards from 16 unit employees out of a total bargaining unit of 19 employees (ALJ 33). Novillo, one of respondent's managers, testified that he solicited authorization cards from three of these unit members, Atrach, Romero and Coronel. As noted above, the direct solicitation by a supervisor of an authorization card generally renders that card invalid. Exclusion of those cards would reduce to 13 the number of valid authorization cards. Without substantial discussion, the ALJ declared that Muniz and Gomez shared a community of interests with other members of the bargaining unit. The record provides a rational basis for concluding that Muniz was at least a part-time dispatcher. However, the record is barren of any indication that Gomez was anything more than a receptionist. If her card were not counted, the total number of authorization cards would be reduced to 12.

When the possible impact of Zarkos upon the card solicitation process is considered, substantial doubt is raised as to whether the Union enjoyed "clear" majority support at anytime. Consequently, it is my recommendation that petitioner's request for an interim bargaining order be denied.

*Remaining Requests for Relief*

■ Where the Regional Director has established reasonable cause to believe that employees were discriminatorily discharged in violation of § 8(a)(3) of the Act, interim

reinstatement and cease and desist orders have been consistently upheld as "just and proper." *NLRB v. Gordon, supra,* 792 F.2d 29; *NLRB v. Coty Messinger Service, supra,* 763 F.2d 92. *Kaynard v. Palby Lingerie, supra,* 625 F.2d 1047, 1053. Reinstatement has been ordered where a bargaining order has been denied. *Id.* It is my recommendation that the petitioner's requests for these remedies be granted as specified below.

## CONCLUSION

For all of the above-stated reasons it is recommended that the petitioner's motion for a bargaining order be denied. With respect to petitioner's other requests for relief, it is recommended that the district court enter an order as follows:

A. Enjoining and restraining Respondent, their officers, agents, representatives, servants, employees, attorneys, successors and assigns, and all members and persons acting in concert or participation with them, from:

1. Coercively interrogating employees concerning their own or other employees' Union membership, activities or support, or asking employees to ascertain and divulge the Union membership, activities or support of other employees.

2. Threatening employees with discharge or any other reprisals in order to discourage employee Union membership, activities or support.

3. Threatening employees with total discontinuance of oil delivery operations, in order to discourage employee Union membership, activities or support.

4. Promising employees wage increases, and other improved terms and conditions of employment, including an increase in their vacation time or pay, in order to discourage employee Union membership, activities or support.

5. Creating an impression of surveillance of employees' Union activity in order to chill or discourage employees in the exercise of such protective activity.

6. Granting wage increases to employees in order to discourage employee Union membership, activities and support.

7. Initiating or circulating among employees affidavits or other documents wherein they require employees to disclaim their Union membership, activities or sympathies, or to revoke their authorizations of the Union as their collective-bargaining representative, or coercively requiring employees to execute such documents.

8. Threatening employees with discharge if they do not disclaim their Union membership, activities or sympathies.

9. Soliciting employee complaints or grievances or impliedly promising their employees increased benefits, or improved terms and conditions of employment in order to discourage employee Union membership, activities or support.

10. Threatening employees that their continued support for the Union will be futile or informing employees that the Employers will operate their own way without the Union, or no way at all.

11. Conditioning employees' recall from layoff upon employees' accepting a different compensation system or upon their voting against the Union in an election conducted by the Board, or upon their withdrawing their unfair labor practice charges previously filed by them with the Board, or upon their agreeing to waive their status as employees under the Act, or agreeing to withdraw their votes cast in an election conducted by the Board, or upon the Union withdrawing unfair labor practice charges filed on their behalf with the Board, in order to discourage their Union membership, activities or sympathies.

12. Discharging, laying off, denying employees vacation monies due them, or in any other manner discriminating against employees because of their Union membership, activity or support.

13. Failing or refusing to offer immediate and unconditional reinstatement or recall to employees Ismael Medina, Luz Muniz, Demaris Gomez, Jesus Campos and Victor Benavides.

14. In any other manner interfering with, restraining or coercing employees in the exercise of the rights guaranteed them under Section 7 of the Act.

B. Requiring Respondent, their officers, agents, representatives, servants, employees, attorneys, successors and assigns, and all persons acting in concert or participation with them, to:

1. On an interim basis rescind or remove from employee personnel files all notices of discharge, allegedly imposed for discriminatory reasons, and refrain from relying on any such discipline as a justification for further discipline.

2. Offer interim unconditional reinstatement or recall to Ismael Medina, Luz Muniz, Demaris Gomez, Jesus Campos and Victor Benavides to their former jobs and conditions of employment, displacing, if necessary, any newly hired or reassigned replacement employees, or, if their jobs no longer exist, to substantially equivalent positions; provided that Victor Benavides, as to whom the Employer has raised questions concerning his eligibility for employment under the Immigration Reform and Control Act of 1986, shall be required as a condition of reinstatement to complete and provide to the Respondent INS Form I–9; and provided that such reinstatement offers shall be made in English, Spanish, Portuguese and Arabic, and that copies of such offers in each of said languages shall be delivered by certified mail to Ismael Medina, Luz Muniz, Demaris Gomez, Jesus Campos and Victor Benavides, at their addresses listed in an attached "Appendix" and copies of such translated offers shall be submitted to the Regional Director of Region 29.

3. In the event an insufficient number of positions exist to accommodate all such unreinstated alleged discriminatees, due to the regular seasonal decline of business, establish a preferential seasonal recall list of such employees, and offer in a nondiscriminatory manner, employment exclusively from that list as job openings for such seasonal work occur.

4. Pay lost wages to Ismael Medina, Luz Muniz, Demaris Gomez, Jesus Campos

and Victor Benavides in an amount to be computed in accordance with *F.W. Woolworth Co.*, 90 NLRB 289 and *New Horizons for the Retarded*, 283 NLRB 1173.

5. Immediately post a copy of the court's opinion and order in English, Spanish, Portuguese and Arabic, at all locations in the Respondent's Brooklyn, New York, facility, where Respondent's notices to their employees are customarily displayed, all of the said copies shall remain free of all obstructions and defacements; copies of said translations shall be provided to the Regional Director of Region 29, at the time of their posting.

6. Mail to each of their current employees, and to Ismael Medina, Luz Muniz, Demaris Gomez, Jesus Campos and Victor Benavides, copies of the court's opinion and order in English, Spanish, Portuguese and Arabic.

7. Serve copies of the court's opinion and order on all officers, managerial and supervisory personnel at the Respondent's Brooklyn, New York facility, together with a written directive signed by a responsible respondent official to comply with all the terms of the order.

8. Within twenty (20) days of the entry of the order, serve upon the court, with a copy submitted to the Regional Director of Region 29 of the Board, a sworn affidavit by a responsible Respondent's official, setting forth with specificity the manner in which Respondent has complied with the terms of the order, including proof of all offers of reinstatement in the manner herein specified, including any seasonal recall list created under the order, mailing of the court's opinion and order to the employees, and service of copies of the court's opinion and order and Respondent's directive upon their officers, managers and supervisors.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this report. Failure to file objections within the specified time waives the right to appeal the district court's order with respect to this report. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.Pro. 6(a); *Small v.*

*Secretary of Health and Human Services,* 892 F.2d 15, 16 (2d Cir.1989).

Dated: Brooklyn, New York

April 3, 1992